JUANITA HUDSON, Appellant, v. HORSESHOE CLUB OPERATING CO.,[1] Respondent.

No. 26631

April 30, 1996                                    916 P.2d 786

---

[5]The issue of damages was not resolved by the district court.

[1]The Department of Administration Appeals Officer is not a party to this appeal under NRAP 3A(a). Accordingly, the clerk of this court shall amend the caption on this court's docket sheet to correspond to the caption on this Opinion.

*Greenman, Goldberg, Raby & Martinez,* Las Vegas, for Appellant.

*Marquis & Aurbach* and *Dale A. Hayes,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

Appellant Juanita Hudson worked as a waitress for respondent Horseshoe Club Operating Company (Horseshoe). Horseshoe accepted an industrial injury claim by Hudson in January 1992. The next month, Horseshoe terminated her employment and then her temporary total disability benefits because Hudson was working at another job in violation of the collective bargaining agreement between her union and Horseshoe. Hudson appealed the denial of benefits, and she and Horseshoe settled the appeal, with Horseshoe agreeing to pay the benefits.

In July 1993, Hudson's doctor released her to light duty status as a counter server with Horseshoe. When Hudson tried to return to work, she was told that she had no job due to her earlier dismissal. Based on Hudson's release to return to work, Horseshoe then ended her temporary total disability benefits. Hudson requested vocational rehabilitation benefits, which Horseshoe denied. An appeals officer affirmed Horseshoe's determinations, and the district court affirmed the appeals officer's decision.

We conclude that the appeals officer erred in determining that Hudson was released to return to the position she held at the time of her injury and in considering Hudson's dismissal from work to be dispositive of the case. We hold that in an industrial injury case, any reasons for an injured employee's discharge which are unrelated to the injury, such as misconduct, are relevant only if the evidence shows that those reasons, rather than the injury, caused the employee's inability to secure subsequent work. We further conclude that even if Hudson's original misconduct was relevant and provided Horseshoe with the right not to offer Hudson light duty employment, Horseshoe waived that right by its conduct.

We therefore reverse the district court's order and remand the case to the appeals officer for instatement of appropriate vocational rehabilitation benefits.

### FACTS

Hudson worked as a waitress for Horseshoe. She filed an industrial injury claim for an injury occurring on January 20, 1992. Horseshoe, a self-insured employer, accepted the claim, and Hudson began to receive temporary total disability (TTD) benefits. About two weeks after the injury, Horseshoe terminated Hudson's employment and then, after another two weeks, her TTD benefits. Horseshoe claimed that Hudson was working at another job in violation of her disability claim and her union's collective bargaining agreement with Horseshoe. (Horseshoe presented strong evidence of this other job to an appeals officer in April 1994, as summarized below.)

Hudson appealed the termination of her TTD benefits. In February 1993, she and Horseshoe settled the appeal, which was still pending. Hudson agreed to "accept as full settlement, retroactive [TTD] payments from May 20, 1992, up through, and including the present date." The parties agreed that she would receive current TTD payments "pending further written determinations by the administrator" for Horseshoe. They agreed that the settlement was "a compromise of a contested industrial insurance claim." By accepting the settlement, Hudson agreed "to waive all her rights regarding" the appeal of her claim, including appeal to any court. Pursuant to the stipulated agreement, an appeals officer dismissed Hudson's appeal with prejudice.

Dr. Dennis Gordon wrote Horseshoe's insurer on June 7, 1993, stating that Hudson

> is really doing quite well. I feel that she should be able to be released to light duty for retraining. She has only worked as a waitress and has been terminated from the Horseshoe so she will need retraining. By this letter, I am releasing her for retraining with no frequent bending or stooping and no lifting over 20 pounds on an intermittent basis. I really think a sedentary or light office job would do for her.

Horseshoe's insurer wrote Dr. Gordon on July 28, 1993, stating: "Please find enclosed a job description available for [Hudson]. Would you please review same and give your approval or disapproval regarding whether or not this meets the job medical restrictions placed upon the claimant." The job description was for a "Coffee Shop Food Server - Counter Server" and stated in part: "There is no heavy lifting required. Employee works a food

counter and brings entrees to the counter, no more than two at a time. Each entree weighs between 2 and 2 1/2 lbs." Dr. Gordon responded in a letter on July 29, 1993:

> I have reviewed Juanita Hudson's job description both alone and with Juanita and we agree that she should at least give it one month's try. Therefore, she is released to the light duty status as described by you and I will see her back after she has been back to work for about one month.

However, when Hudson tried to go back to work, she was told that she had no job due to her earlier termination.

On August 6, 1993, Horseshoe's insurer advised Hudson that "pursuant to Dr. Gordon's medical report of July 29, 1993, you were released to return to your previous job position . . . . Therefore, the [TTD] benefits cease as of July 29, 1993." Hudson appealed this determination, and on October 13, 1993, a hearing officer affirmed it. The hearing officer concluded that Hudson was not entitled to TTD benefits because Dr. Gordon determined that she was capable of gainful employment. The officer did not decide whether Dr. Gordon had released Hudson to the employment she held when injured or whether she was entitled to rehabilitation benefits.

Hudson requested vocational rehabilitation benefits from the insurer on October 12, 1993. The insurer denied the request. Hudson's appeal of this denial and her appeal of the termination of her TTD benefits were combined. An appeals officer held a hearing on these matters on April 5, 1994. At the hearing, Hudson's counsel objected that exhibits offered by Horseshoe regarding Hudson's earlier termination for engaging in outside work were irrelevant. The appeals officer admitted them provisionally and, as it turned out, considered them relevant.

Hudson testified that before her injury she worked as a waitress, which required her to carry food on a tray out to tables. She said that she and the other waitresses also filled the position of counter server about twice a month on a rotating basis, but that it was never her or anyone else's full-time job. The difference between the positions was that the counter server did not have to carry as heavy a tray. Horseshoe called its restaurant manager, whose testimony regarding Hudson's work and the positions of waitress and counter server was consistent with Hudson's.

When Horseshoe tried to cross-examine Hudson in regard to her earlier termination, her counsel objected. The appeals officer stated: "I understand what [Hudson's counsel's] argument is, but I think we still have to establish the fact that she was terminated for violation of collective bargaining." A little later, Hudson's counsel objected again and said: "If we're going to litigate the

issue of whether that termination was proper or not, then that's fine, I've got a lot of evidence I can introduce on that." The appeals officer responded: "We've already established that she was terminated and the reason she was terminated, so I don't think—there's no need to do any more questioning there."

The evidence presented by Horseshoe on this issue included the following. The collective bargaining agreement governing Hudson's employment provided:

> Any employee on leave of absence who engages in new outside employment or expands the scope of current outside employment or actively works at current outside employment in conflict with his/her disability shall have his/her employment with the Employer terminated immediately.

In an affidavit, Annette Fennell-McGhee stated that she managed personnel at Horseshoe's coffee shop. On January 20, 1992, Hudson requested a thirty-day leave of absence so that she could open a new business, and Fennell-McGhee told Hudson that was not possible. Hudson "then stated that she had experienced back problems and would go to her doctor to get a medical excuse so that she could have the time off. I later learned that during her shift that night, she had fallen at work and injured herself." In another affidavit, Timothy Sellers, a fellow worker of Hudson's, stated Hudson told him that she was co-owner of Sin's Fine Jewelry but that her name did not appear on any business documents. After Hudson's job injury, Sellers visited Hudson at the jewelry store, and Hudson told him that though she was in pain, she could answer phones and take care of customers.

Horseshoe provided the signed statement of Paula Avery, the Horseshoe department head who signed Hudson's termination slip. Avery phoned Sin's Fine Jewelry on February 5, 1992, and acted like a customer. She spoke with Hudson, who answered her questions regarding store items and offered to help her if she came to the store. Horseshoe also presented business cards for Sin's Fine Jewelry with the names of Hudson and another woman, Sally Bajjali, printed on them.

Hudson offered two documents relevant to this issue, a notarized handwritten statement by Sally Bajjali and an affidavit by West Stauffer. Bajjali wrote that she opened Sin's Jewelry from the third to the sixth of February and then closed it because she had to go find a missing son. She stated that Hudson

> never worked for me at all. She came to visit with me because she is my friend. . . .
> I have printed the cards by mistake. When I printed the cards at that time, I was hoping to ask her to work for me, but I have found out that to apply for *second hand license* it takes *90 days*.

Stauffer stated that he managed the property which Bajjali rented for a jewelry store and that Bajjali

> only had possession of the lease space for a very short period of time, was in the process of making tenant improvements and then for family reasons wanted to cancel the lease. . . . [T]he lease was cancelled and to the knowledge of your Affiant the jewelry store never actually opened for ordinary business.

On April 20, 1994, the appeals officer affirmed Horseshoe's determination. He found that Horseshoe had terminated Hudson in compliance with the collective bargaining agreement for her outside work. He also found that Hudson, "but for her termination for cause, would have been returned to the job position she held before her injury notwithstanding any limitation placed by Dr. Gordon." However, the appeals officer's decision and order elsewhere referred to the "modified position" and "modified duty position" which Horseshoe would have offered Hudson. He concluded that vocational rehabilitation benefits terminate when a disabled worker is returned to gainful employment and that, but for her termination, Hudson would have returned to such employment.

On November 22, 1994, the district court affirmed the appeals officer's decision and order and denied Hudson's petition for judicial review.

## DISCUSSION

The function of this court in reviewing an administrative decision is identical to the district court's. Titanium Metals Corp. v. Clark County, 99 Nev. 397, 399, 663 P.2d 355, 357 (1983). A reviewing court shall not substitute its judgment for that of an agency in regard to a question of fact. NRS 233B.135(3). The standard for such review is whether the agency's decision was clearly erroneous or an arbitrary abuse of discretion. NRS 233B.135(3)(e) and (f). However, questions of law are reviewed de novo. SIIS v. United Exposition Services Co., 109 Nev. 28, 30, 846 P.2d 294, 295 (1993).

*Whether Hudson was released to return to the employment she held when she was injured*

An injured employee is not eligible for vocational rehabilitation unless the treating physician "approves the return of the injured employee to work but imposes permanent restrictions that

prevent the injured employee from returning to the position that he held at the time of his injury." NRS 616C.590(1)(a).[2]

The appeals officer found that except for her firing, Hudson "would have been returned to the job position she held before her injury notwithstanding any limitation placed by Dr. Gordon." Horseshoe argues that substantial evidence supports this finding because the counter server position was part of Hudson's former job duties. However, the appeals officer also tellingly referred to the "modified position" and "modified duty position" which Horseshoe would have offered Hudson.

The record shows that the appeals officer clearly erred on this issue. Hudson's former work was as a waitress. This occasionally included lighter work behind the counter, but usually required her to carry heavy trays of food to tables. Dr. Gordon did not want Hudson to do the lifting required of a waitress and released her to work only as a counter server, not as a waitress. Full-time counter server was not the job she held before her accident.

*Whether it was properly established that Hudson's termination was justified*

Hudson argues that whether or not she was terminated is irrelevant to her right to rehabilitation benefits. (We discuss this issue below.) However, if this court disagrees with that proposition, she asserts that the evidence shows that she never worked at the jewelry store. She also asserts that this issue was never litigated and that this court should remand the case for determination of the issue if it is relevant.

First, we conclude that the evidence presented to the appeals officer supports a finding that Hudson worked at the jewelry store in violation of the collective bargaining agreement provision prohibiting employees on leave from engaging in new outside employment. Hudson points out that no evidence showed that she had received pay. However, her statements to Fennell-McGhee and Sellers that she was opening a business indicate that she was working for compensation. Her name on the business cards indicates that she was not just helping a friend out by answering the phone, as claimed in her brief to this court. (Bajjali's notarized statement that the business cards were a mistake and Avery's statement regarding her phone call to Hudson at the jewelry store do not appear to be sworn statements. We give them

---

[2]See note 3 below.

no weight in our analysis.) Seller's affidavit indicates that Hudson was working at, not just visiting, the store. Hudson presented evidence that the store was open only for about four days, but the shortness of the work would not prevent it from being a violation of the collective bargaining agreement.

Second, we conclude that the issue was presented to the appeals officer. Although Hudson attempted to exclude Horseshoe's exhibits on the issue, they came in. The appeals officer ended cross-examination of Hudson on the matter, but not because he considered it irrelevant. He ruled that the issue was decided, and Hudson's counsel did not protest. Hudson now claims that she was "ready, willing, and able" to prove she had no outside employment. The record shows instead that Hudson's counsel wished to avoid the issue. However, he was aware that the issue was central to Horseshoe's case, for example as argued in Horseshoe's brief to the appeals officer, and he attached Bajjali's statement and Stauffer's affidavit, which had relevance only to this issue, to Hudson's own hearing statement. When Hudson's counsel objected to exploration of the issue, the appeals officer said that it was necessary "to establish the fact that she was terminated for violation of collective bargaining." Soon afterwards, the officer stated: "We've already established that she was terminated and the reason she was terminated. . . ."

We conclude that the reason for Hudson's termination was litigated and that substantial evidence supports the appeals officer's finding that the termination was justified.

*Whether Hudson's termination for cause was a proper basis to deny her vocational rehabilitation benefits*

NRS 616C.590(1) provides that generally

> an injured employee is not eligible for vocational rehabilitation services, unless:
>
> (a) The treating physician or chiropractor approves the return of the injured employee to work but imposes permanent restrictions that prevent the injured employee from returning to the position that he held at the time of his injury;
>
> (b) The injured employee's employer does not offer employment that the employee is eligible for considering the restrictions imposed pursuant to paragraph (a); and
>
> (c) The injured employee is unable to return to gainful employment at a gross wage that is equal to or greater than 80 percent of the gross wage that he was earning at the time of his injury.[3]

---

[3]A somewhat different version of this statutory provision was codified as

Horseshoe cites Coon v. Rycenga Homes, 379 N.W.2d 480, 483 (Mich. Ct. App. 1985), for the general rule that an employee who "is discharged from performing favored work for just cause is not entitled to receive workers' compensation benefits." However, it appears that the majority of jurisdictions reject this rule.

The Arizona Supreme Court considered "whether, and to what extent, termination of post-injury employment for misconduct affects an employee's right to recover workers' compensation benefits for loss of earning capacity arising out of the earlier industrial injury." Arizona DPS v. Industrial Com'n, 861 P.2d 603, 605 (Ariz. 1993). The court stated that

> we fail to see the wisdom in holding that an employee who loses a post-injury job because of misconduct voluntarily forfeits benefits for a loss of earning capacity which, depending on the nature and extent of disability, may be quite profound. The purpose of the Arizona workers' compensation scheme, "to dispense with, as much as possible, the litigation between employer and employee and to place upon industry the burden of compensation," *Marriott,* 147 Ariz. at 121, 708 P.2d at 1312, would hardly be served by such a punitive rule.

*Id.* at 608. The basic rule is that losses attributable to industrial injuries are compensable, but losses attributable to other factors are not. *Id.* at 606.

> Misconduct should be—and is—irrelevant except as it pertains to this causation question. Payment of benefits does not depend on a claimant's good moral character, but is based simply on an injury within the scope of the workers' compensation statutes.
>
> Termination reasons unrelated to the industrial injury, such as layoff, strike, economic conditions, or misconduct become significant only where the evidence demonstrates that they, rather than claimant's disability, caused the *subsequent* inability to secure work.

*Id.* at 608 (citations omitted; emphasis added).

The Minnesota Supreme Court has similarly held that

> a justifiable discharge for misconduct suspends an injured

---

NRS 616.222(3)(a) at the time of Hudson's injury. Among other differences, it did not require that the physician-imposed restrictions in paragraph (a) be permanent. 1993 Nev. Stat., ch. 265, § 115 at 703-04. Therefore, the permanence of Hudson's restrictions is apparently not an issue. *See also* former NAC 616.076. The former statute also did not have the requirement in paragraph (c) regarding inability to return to other gainful employment at an adequate wage.

employee's right to wage loss benefits; but the suspension of entitlement to wage loss benefits will be lifted once it has become demonstrable that the employee's work-related disability is the cause of the employee's inability to find or hold *new* employment. Such a determination should be made upon consideration of the totality of the circumstances including the usual work search "requirements."

Marsolek v. George A. Hormel Co., 438 N.W.2d 922, 924 (Minn. 1989) (emphasis added); *accord* PDM Molding, Inc. v. Stanberg, 898 P.2d 542, 549 (Colo. 1995); State ex rel. Watts v. Schottenstein Stores, 623 N.E.2d 1202, 1205 (Ohio 1993).

These cases stand for the rule that an employer who discharges an injured employee for cause is not liable for that employee's disability benefits unless the record establishes that the employee's disability rather than her discharge caused her wage loss or inability to obtain work.

This rule is consistent with a recent opinion by this court. Jerry's Nugget v. Keith, 111 Nev. 49, 888 P.2d 921 (1995). In *Jerry's,* this court held that vocational rehabilitation benefits can be awarded upon a change in circumstances. *Id.* at 53, 888 P.2d at 924. The claimant in *Jerry's* was injured at work, received disability benefits, returned to work, and then was fired for cause. *Id.* at 50, 888 P.2d at 922. The firing did not prevent this court from concluding that a later change in the claimant's circumstances made him eligible for rehabilitation benefits. However, our opinion did not address why the firing did not preclude benefits, even though an appeals officer based denial of benefits in part on the claimant's dismissal. *Id.* at 51, 888 P.2d at 922. This result is inconsistent with the view that a discharge for cause automatically forfeits a claimant's rights to all industrial insurance benefits.[4]

We consider the approach taken in Arizona and other jurisdictions persuasive and hold that in an industrial injury case, any

---

[4]Horseshoe points out that in 1993 the Legislature amended the statutory provisions regarding reopening claims, adding a subsection that provides that an employee whose claim is reopened

> is not entitled to vocational rehabilitation services . . . if, before his claim was reopened, he:
> (a) Retired; or
> (b) Otherwise voluntarily removed himself from the work force,
> for reasons unrelated to the injury for which the claim was originally made.

NRS 616C.390(6); 1993 Nev. Stat., ch. 265, § 187 at 742. The instant case does not involve reopening a claim. Even if this provision were applicable, it is difficult to see how dismissal from a particular job for cause could be construed as voluntary removal from the work force.

reasons for an injured employee's discharge which are unrelated to the injury—such as misconduct, strike, or economic condition—are relevant only if the evidence shows that they, rather than the injury, caused the employee's inability to secure subsequent work.

It might be argued that in this case Hudson's misconduct is relevant because it caused Horseshoe's refusal to rehire her and her consequent need for vocational rehabilitation. However, we do not need to address this issue because we conclude that Horseshoe waived any right it had to refuse to reemploy Hudson. Hudson's misconduct of working at the jewelry store provided Horseshoe with legitimate grounds to discharge Hudson. Horseshoe also denied her TTD benefits on those grounds. The propriety of this denial is not before us because Horseshoe for some reason agreed to retract that denial. Horseshoe then affirmatively misled Hudson and her doctor into believing that it would put Hudson back to work at a light duty position if the doctor released her to return to work. Waiver occurs where a party knows of an existing right and either actually intends to relinquish the right or exhibits conduct so inconsistent with an intent to enforce the right as to induce a reasonable belief that the right has been relinquished. McKeeman v. General American Life Ins., 111 Nev. 1042, 1048, 899 P.2d 1124, 1128 (1995). Therefore, by its conduct Horseshoe waived any right it had not to offer suitable employment to Hudson without incurring liability for rehabilitation services under NRS 616C.590(1)(b).

Therefore, the appeals officer erred in concluding that Hudson's dismissal justified Horseshoe's refusal to offer her suitable employment. Given Horseshoe's failure to offer her employment, the pertinent issue is whether Hudson's injury restricts her from returning to the position she held at the time of her injury.[5] Dr. Gordon's reports established that Hudson's injury did restrict such a return. We therefore reverse the district court's order denying Hudson's petition for judicial review and remand this matter to the appeals officer for instatement of appropriate vocational rehabilitation benefits.

## CONCLUSION.

The appeals officer clearly erred in determining that Hudson was released to return to the position she held at the time of her

---

[5]Under current NRS 616C.590(1), if an employer refuses to offer an injured employee suitable employment, the pertinent issue would be whether the employee's injury restricts her from returning both to the position she held at the time of her injury *and* to other gainful employment at an adequate wage. See note 3 above.

injury. The appeals officer did not err in determining that Hudson's dismissal from work was justified; however, he erred in considering this determination to be dispositive of the case. We hold that in an industrial injury case, any reasons for an injured employee's discharge which are unrelated to the injury—such as misconduct, strike, or economic condition—are relevant only if the evidence shows that they, rather than the injury, caused the employee's inability to secure subsequent work. Even if Hudson's earlier misconduct was relevant and provided Horseshoe with the right not to offer Hudson light duty employment, Horseshoe waived that right by its conduct.

We reverse the district court's order denying the petition for judicial review and remand the case to the appeals officer for instatement of appropriate vocational rehabilitation benefits.