855 So.2d 1173 (2003)
Kenneth STEWART, Appellant,
v.
CRS RINKER MATERIALS CORP., Appellees.
No. 1D02-1469.
District Court of Appeal of Florida, First District.
October 3, 2003.
*1174 Mark Dickstein, Esq. of Feldman, Dickstein & Getz, LLP, North Miami Beach; Jay M. Levy, Esq. of Jay M. Levy, P.A., Miami, for Appellant.
Frank Angione, Esq. and April R. Burnette, Esq. of Benson, McGrath, Douglas, Angione, Phillips & Ross, P.A., Ft. Lauderdale, for Appellees.
LEWIS, J.
Claimant, Kenneth Stewart, seeks review of a workers' compensation order and argues that the Judge of Compensation Claims ("JCC") erred in denying temporary partial disability ("TPD") benefits for the time periods from November 1, 2000, through December 10, 2000, and from January 4, 2001, through April 24, 2001, because the JCC improperly based her denial solely upon appellant's termination from his employment. Because the JCC relied solely on claimant's termination as a basis for the denial of TPD benefits for these time periods and failed to consider whether claimant satisfied his burden of establishing a causal connection between his work-related injury and his loss of earning capacity after his termination, we reverse the order and remand with directions. Claimant also contends that the JCC erred in denying TPD benefits for the time period from July 21, 2001, through September 23, 2001, because the JCC did not find that claimant's relocation during this period was the product of an improper motivation on his part. We agree and, therefore, reverse the JCC's denial of TPD benefits for this time period as well.
Claimant, who worked as a plant laborer for CSR Rinker Materials Corporation ("Employer"), which is located in West Palm Beach, Florida, suffered a compensable work-related injury on October 5, 2000, when a heavy truss "slammed [him] to the ground." During the hearing before the JCC, claimant testified that his plant laborer position had consisted of cutting steel, building trusses, loading and unloading trucks, and assisting in other work. While claimant initially earned $7.50 an *1175 hour in this position, he eventually began earning $8.00 an hour.
According to claimant, as a result of his work-related accident, he suffered serious pain down his back, buttocks, and through his left leg. On the day of the accident, claimant sought medical treatment and was prescribed pain medication. Claimant subsequently underwent an MRI and received physical therapy. Claimant further testified that, while he continued to work with the Employer after his work-related accident, the Employer modified his responsibilities to light-duty work such as cleaning the shop. Claimant worked for the Employer for approximately three weeks after his work-related accident until the Employer terminated him on November 1, 2000, for excessive absenteeism.[1] According to claimant, his low back complaints worsened after his termination.
Subsequent to his termination, claimant unsuccessfully applied for different positions with three hospitals and various fast food restaurants and for vocational training. On May 23, 2001, Ocean Tree Condominium ("Ocean Tree") initially hired claimant as a maintenance technician but eventually reassigned him to a housekeeping position as a result of his work restrictions. In July 2001, claimant relocated to Pensacola because he and his wife were having marital problems and he thought he needed "to be with his family, be back home with [his] mom." While there, claimant worked for the city of Pensacola as a laborer for eight hours one day and four hours the next, earning $6.25 an hour. Due to his inability to perform his job duties, claimant quit his job after those two days. Claimant returned to West Palm Beach in September 2001 and resumed working for Ocean Tree, where he was working at the time of the hearing, earning $9.50 an hour.
Via deposition, Dr. Musso testified that, after evaluating claimant on October 30, 2000, and conducting an MRI, his opinion was that claimant suffered from a lumbar disk herniation at L5-S1. Dr. Musso recommended that claimant begin a physical therapy program, placed claimant on light-duty work status, and maintained him on such after claimant's November 13, 2000, visit. According to Dr. Musso, when he first evaluated claimant, claimant was on light-duty work status, with a maximum lifting restriction of twenty pounds, and was unable to return to work at that time. After recommending that claimant undergo a functional capacity evaluation ("FCE") and after receiving those test results, Dr. Musso placed claimant at maximum medical improvement ("MMI") on January 4, 2001, with a 7% permanent physical impairment rating. At that time, Dr. Musso did not place any work restrictions on claimant due to claimant's uncooperativeness with the FCE. However, when Dr. Musso saw claimant on March 15, 2001, he "put him back to work" on modified-work duty.
Dr. Rubenstein, who performed claimant's FCE on December 20, 2000, and who testified via deposition, opined that claimant was able to work in a sedentary to light-duty capacity. In his medical report, Dr. Rubenstein also opined that claimant was unable to return to his previous job description. Dr. Krost, who initially saw claimant on April 25, 2001, testified, via deposition, that claimant suffered a low *1176 back injury and concurred with claimant's light-duty work status. While Dr. Krost did not believe that claimant had reached MMI at that time, he subsequently placed claimant at MMI on October 17, 2001. As a result of his Independent Medical Evaluation, which he conducted on May 17, 2001, Dr. Reuter opined that claimant suffered from cervical strain/sprain, lumbar strain/sprain, lumbar disc herniation, and radiculitis. Dr. Reuter further opined that claimant was able to work in a modified light-duty status with a lifting restriction of no more than fifteen pounds and with significant restrictions as to bending, sitting, and stooping.
While in Pensacola, claimant was authorized to be seen and treated by Dr. Buchalter, who agreed with a recommendation that claimant undergo epidural steroid injections and that he continue on light-duty work status. Dr. Buchalter released claimant to full-time maintenance work on a light-duty work status pending the completion of the injective therapy. He opined that claimant had not yet reached MMI.
In her order, the JCC set forth that, while the Employer terminated claimant on November 1, 2000, for violation of the Employer's Absentee Policy, claimant could still be entitled to benefits if he satisfied the burden of showing that his work-related injury contributed to his wage loss after the termination. The JCC also set forth that, although a job search was no longer a requirement for TPD benefits, here, claimant testified that he unsuccessfully applied for various jobs following his termination. After setting forth the pertinent facts, the JCC determined that:
Claimant had demonstrated his earning capacity in the job with the Employer prior to his termination for excessive absenteeism. But for his excessive absences and tardiness, he would have remained an Employee of the Employer. Therefore, I find that for the period of November 1, 2000, through December 10, 2000, the Claimant failed to demonstrate that his loss of earnings was caused by an incapacity to earn because of the work injury, either in the job he had with the Employer or any other Employment. Accordingly, the claim for [TPD] benefits ... is denied.
With regard to the time period from January 4, 2001, through April 24, 2001, the JCC rejected Dr. Musso's initial opinion that claimant reached MMI on January 4, 2001. According to the JCC, she found Dr. Musso's revised March 15, 2001, opinion of modified duty to be more consistent with the FCE results and the fact that claimant's work injury warranted an impairment rating. The JCC then set forth that:
Therefore, I find that for the period of January 4, 2001, through March 15, 2001 and thereafter through April 24, 2001, the date before the Claimant was first seen by Dr. Krost, the Claimant was able to work with restrictions. However, I find that the Claimant failed in his burden to show that his loss of earnings for the period was caused by an incapacity because of the work injury. As I previously found, post-October 5, 2000, the Claimant demonstrated an earnings capacity with the Employer herein until he was terminated for cause on November 1, 2000. For the period prior to the termination, the only evidence put forth by the Claimant with respect to his diminished earnings, was lost time for attendance at doctor appointments and physical therapy, and allegedly being *1177 sent home due to side effects experienced from pain medication. He gave no testimony of any injury related physical problems in performing his light duty job of cleaning the shop.
Consequently, the JCC denied TPD benefits for this time period.
As to claimant's claim for TPD benefits for the time period from July 21, 2001, through September 23, 2001, the JCC found that claimant remained in his position at Ocean Tree until July 20, 2001, when he relocated to Pensacola as a result of family/marital problems. Based upon claimant's unrefuted testimony of physical problems experienced during his brief attempt at working for the city of Pensacola and Dr. Buchalter's objective examination findings, the JCC awarded claimant TPD benefits for the two days claimant worked. The JCC then concluded that:
Therefore, but for his relocation to North Florida, [claimant] would have maintained the earning capacity he had established with Ocean Tree Condominium. Therefore, his loss of earnings after his employment with the city of Pensacola and before resuming work at Ocean Tree Condominium, is not the result of an injury related disability, but rather the result of his voluntary hiatus from the job he ultimately returned to. I therefore find no entitlement to disability benefits for the period of July 21, 2001 through September 23, 2001, with the exception of the [TPD] benefits I award for the Claimant's loss of earnings with the city of Pensacola, which is two days, twelve hours at $6.25 per hour.
This appeal followed.
Claimant first contends that the JCC erred in denying TPD benefits for the periods from November 1, 2000, through December 10, 2000, and from January 4, 2001, through April 24, 2001, because the JCC improperly based her denial solely upon claimant's termination from his employment with the Employer. Workers' compensation benefits are not precluded merely because some portion of the wage loss is attributable to a reason unrelated to the injury, such as economic factors, a discharge for good cause, or seasonal layoffs. Betancourt v. Sears Roebuck & Co., 693 So.2d 680, 683-84 (Fla. 1st DCA 1997) (en banc) (citations omitted). "A claimant may still be entitled to benefits if the compensable injury left the claimant in a condition which precludes employment within his or her abilities at his or her prior wage." Id. at 684 (citation omitted). Even though a claimant may be terminated from his or her employment for insubordination, the claimant may still be entitled to benefits if he or she satisfies the burden of demonstrating that the injury contributed to the wage loss after the termination. Jefferson v. Wayne Dalton Corp., 793 So.2d 1081, 1084 (Fla. 1st DCA 2001) (citing Betancourt, 693 So.2d at 684) (emphasis added). Whether a claimant has demonstrated a causal connection between his or her compensable injury and the wage loss is a question of fact to be determined by the JCC upon a consideration of the totality of the circumstances. Id. (citations omitted).
In her order, the JCC, citing Jefferson as authority, acknowledged that claimant could still be eligible for TPD benefits if he satisfied his burden of showing that his work-related injury contributed to his wage loss after his termination. The JCC also set forth the pertinent facts including claimant's light-duty work status and his unsuccessful job search. However, the JCC then denied claimant's claim for TPD *1178 benefits for the period between November 1, 2000, and December 10, 2000, finding that, but for claimant's absences and tardiness, he would have remained the Employer's employee. With regard to the JCC's denial of TPD benefits for the period between January 4, 2001, through April 24, 2001, the JCC similarly referred to claimant's termination. The JCC also found that, with respect to the period prior to claimant's termination, claimant gave no testimony of any injury-related physical problems in performing his light-duty job of cleaning the Employer's shop.
Such conclusory findings regarding claimant's termination contradict the JCC's acknowledgment of the pertinent authority. Moreover, the JCC's focus on what the evidence established prior to claimant's termination demonstrates the significance that the JCC placed upon claimant's termination in denying TPD benefits for periods subsequent to the termination. Once the JCC determined that claimant had been terminated, the question then became whether claimant satisfied his burden of showing a causal connection between his injury and loss of earning capacity after his termination. See Jefferson, 793 So.2d at 1084; Betancourt, 693 So.2d at 684. As such, the JCC's finding that claimant was terminated for reasons unrelated to his work-related injury did not fully resolve claimant's alleged entitlement to TPD benefits. See Ramos v. Wal-Mart Store, # 0817, 789 So.2d 1240, 1240 (Fla. 1st DCA 2001). Accordingly, we reverse the JCC's order to the extent that the JCC denied TPD benefits for the periods from November 1, 2000, through December 10, 2000, and January 4, 2001, through April 24, 2001, and remand with directions to reconsider the evidence, such as claimant's continued light-duty work status and his unsuccessful job search, in determining whether claimant is entitled to TPD benefits for these time periods in light of this opinion.
In his second issue on appeal, claimant avers that the JCC erred in denying TPD benefits for the time period from July 21, 2001, through September 23, 2001, because the JCC did not find that his relocation to Pensacola was the product of an improper motivation on his part. In support of his averment, claimant relies upon our decision in Hurley v. Stuart Fine Foods, 687 So.2d 310, 310-11 (Fla. 1st DCA 1997), wherein the claimant appealed the JCC's order denying her claim for TPD benefits from August 2, 1994, and continuing and argued that the JCC erroneously found that the claimant had voluntarily limited her income by refusing a modified cashier's position. In our opinion, we set forth that the JCC found that the claimant moved in with her parents in a different Florida city for financial reasons. Id. at 311 n. 3. We also determined that the JCC made no finding that the claimant's move was the result of "`improper motivation'" and that "`there [was] no evidence that claimant's relocation following h[er] injury was motivated by a desire to avoid work.'" Id. at 311 (quoting Genelus v. Boran, Craig, Schreck Constr. Co., 438 So.2d 964, 966 (Fla. 1st DCA 1983)). As such, we held that the JCC's denial of benefits because the claimant voluntarily moved, without finding that the move was the product of improper motivation, had to be reversed. Id.; see also Dep't of Transp. v. Montero, 568 So.2d 65, 65 (Fla. 1st DCA 1990) (holding that an injured worker is not confined to living in the pre-injury location and that, absent an improper motivation, a departure therefrom does not preclude compensation benefits); *1179 Jackson, 461 So.2d at 248-49 (affirming the JCC's order granting the claimant benefits on the basis that her wage loss was related to her industrial injury and determining that, although the claimant obtained and accepted another job offer within Florida, her sudden and temporary departure from the state, which was due to her fiance suffering a life-threatening accident in North Carolina, was not motivated by any desire to avoid work and did not show a lack of due diligence or voluntary limitation of income precluding an award of wage loss benefits).
Here, claimant's hearing testimony established that he relocated to Pensacola because he and his wife were having marital problems and because he desired to be with his family. In denying claimant's claim for TPD benefits for this time period, the JCC found that, but for claimant's relocation to Pensacola, he would have maintained his earning capacity that he had established working for Ocean Tree. Similar to the JCC's finding in Hurley, the JCC in the instant case found that claimant's loss of earnings after his employment with the city of Pensacola and before returning to work at Ocean Tree was "not the result of an injury related disability, but rather the result of his voluntary hiatus from the job he ultimately returned to," and found no entitlement to disability benefits for this period, with the exception of the two days claimant worked in Pensacola. However, based upon the foregoing authority, because the JCC did not find that claimant was guided by an improper motivation, i.e., a desire to avoid work, in relocating to Pensacola, we also reverse the denial of TPD benefits for this time period.
REVERSED and REMANDED with directions.
ERVIN, J., CONCURS; ALLEN, J., DISSENTS WITH WRITTEN OPINION.
ALLEN, J., dissenting.
The judge of compensation claims correctly recited in her order that the relevant issue for her determination as to the claims for temporary partial disability benefits was whether the industrial injury was causally related to the claimant's loss of wages. The judge's order also reflected her understanding that neither the claimant's termination from his employment due to his misconduct nor his later resignation from another job precluded him from receiving temporary partial disability benefits for the periods following the termination and resignation. But the judge properly recognized that the claimant would still be required to prove that the wage loss during these periods was caused by the industrial injury, rather than merely by the termination or resignation.
After considering the evidence presented, the judge found that the industrial injury did not cause the wage loss during the relevant periods. The judge found instead that the wage loss for the first two periods was caused by the termination and that the wage loss during the third period was caused by the resignation. The majority does not suggest that the evidence presented to the judge precluded these findings. But the majority nevertheless reverses the denial of these claims and remands for further consideration because the judge observed in the course of making her rulings that, but for the termination and resignation, the claimant would have been working during all of the relevant periods of time. The majority perceives this observation as somehow inconsistent with the judge's duty to determine whether the industrial injury contributed to the wage loss. I disagree.
I do not perceive the judge's observation as reflecting any misunderstanding as to *1180 the relevant law. It seems to me that it merely reflects a truism logically flowing from the finding that the termination and resignation, and not the industrial injury, were the causes of the wage loss.
Because the judge correctly recited the relevant law to be applied in determining the claimant's entitlement to temporary partial disability benefits, because the record provides support for the judge's findings of fact, and because the judge's observation does not suggest to me that she misapplied the law in making these findings of fact, I would affirm the order under review. I therefore respectfully dissent from the majority opinion.
NOTES
[1] The majority of claimant's absences and instances of tardiness occurred prior to his work-related accident.