949 So.2d 242 (2007)
Dawn ARNOLD, Appellant,
v.
FLORIDA'S BLOOD CENTERS, INC. and AIG Claim Services, Inc., Appellees.
No. 1D05-4749.
District Court of Appeal of Florida, First District.
January 24, 2007.
*243 Samuel S. Henderson of Henderson and Futchko, P.A., Melbourne, for Appellant.
Margaret E. Sojourner and Philip R. Augustine of Langston, Hess, Bolton, Shepard & Augustine, P.A., Maitland, for Appellees.
BENTON, J.
Dawn Arnold appeals an order of a judge of compensation claims denying her temporary partial disability benefits on grounds she left her employment voluntarily. Viewed in light of the record as a whole, however, the judge's finding that she left voluntarily lacks any substantial support. Accordingly, we reverse and remand.
That Ms. Arnold's employment at Florida's Blood Centers, Inc. (FBC) was the major contributing cause of her bilateral carpal tunnel syndrome and tenosynovitis is not in dispute here. At issue is whether this concededly work-related condition caused a disability that actually resulted in a loss of wages. The order under review attributes Ms. Arnold's wage loss to her putative decision to forgo work available to her. But competent, substantial evidence does not support this view.
Ms. Arnold left FBC because her employer, concerned her new work restrictions would complicate scheduling, refused *244 to allow her to continue working.[1] The evidence provides no support for the view that she left her employment "without just cause." § 440.15(7), Fla. Stat. (2004) ("If the employee leaves her . . . employment while receiving temporary partial benefits without just cause. . . ."). She left her employment because she was told she no longer had a job. This is both "just cause," and a reason directly attributable to her employer.
Despite overwhelming evidence to the contrary, the order under review states that she voluntarily left her employment. On this basis, the order concludes that FBC is entitled, pursuant to section 440.15(7), Florida Statutes (2004), to impute to her the income she would have earned,[2] if she had not (according to the order) quit her job at FBC. On the same, unsupported factual premise, the order states that Ms. Arnold is not entitled to temporary partial disability benefits under the (inapposite) rationale of Vencor Hosp. v. Ahles, 727 So.2d 968, 969 (Fla. 1st DCA 1998) (denying disability benefits on grounds that "the reduction in the claimant's income below the minimum statutory level was caused by her termination for misconduct, not her disability").
Ms. Arnold worked as a "lab specialist" for FBC from May 13, 2002, until November 28, 2004, operating a centrifuge and packaging blood and blood products. Toward the end of this period, her normal work schedule was five days per week, eight hours per day, but she typically worked weekends, as well, by herself. Earlier in her time with FBC, she had worked four weekdays per week, ten hours per day, also working weekends.
Her duties included preparing whole blood and plasma to be sent to area hospitals, and platelets for shipping either to area hospitals or overseas. After FBC began using a different type of bag for packaging blood (products), Ms. Arnold began to suffer from what proved to be bilateral carpal tunnel syndrome and tenosynovitis. She reported pain she had experienced on the job to her supervisor, Jon Nickey, on November 10, 2004, telling him that she had been experiencing symptoms including "shooting pains" for six months, and that they had intensified greatly recently.
Mr. Nickey said that he would let FBC's Orlando office know. He later told her that the Orlando office had been notified and would get in touch with her. Ms. Arnold continued to work her regular hours, including the weekend shift by herself, performing all her regular duties without accommodation.[3] She testified *245 that her hands were "in severe pain" as a result and that she was experiencing numbness.
When she called the office of Dr. Homi Cooper, attempting to obtain medical care, she was told that FBC or its insurance carrier had to schedule the appointment, and had not done so yet. She placed other calls to FBC personnel, FBC's insurance carrier, and the doctor's office in an effort to obtain medical care until, on November 17, 2004, FBC's Orlando office informed her that an appointment had been scheduled for her with Dr. Cooper on November 18, 2004.
Ms. Arnold testified that, by the time she was notified of the appointment, she was "just physically furious" because her hands had become so painful, and that she was "up to wit's end just because my hands hurt so bad, I had to work the whole weekend by myself and I really didn't see that changing" and that she had "decided it would be best if I just gave my resignation." She did "give her resignation" in a letter dated November 17, 2004, "to be effective 11/28/2004."
Dr. Cooper examined and evaluated Ms. Arnold, and placed restrictions on her working, including limiting performance of her regular duties at FBC to no more than forty-five minutes to an hour at a stretch, to be followed by modified duty devoid of forceful pushing, pulling, twisting or gripping of the hands for forty-five minutes to an hour. Dr. Cooper also prescribed medication and bilateral wrist splints, and ordered EMG and nerve conduction studies. Hopeful her medical problems were manageable, Ms. Arnold thought better of resigning.
On November 24, 2004, she gave her supervisor, Mr. Nickey, a letter disavowing her resignation and seeking to withdraw her letter of November 17, 2004. The later letter stated:
I would like to ask that you allow me to withdraw my [letter of] resignation. I did some research on our benefits, etc and I feel it is in my best interest to stay at least until the new year. I would however like to ask that after the Jan. 1, 05 I be allowed to go back to my schedule of 4 days a week (Thurs-Friday-Sat-Sun).
She explained at trial that "maybe I was going to start to be able to see some relief," and that she had become concerned about losing her job and benefits, including health insurance for her children.
When Ms. Arnold spoke to Mr. Nickey about continuing to work for FBC, he told her (perhaps disingenuously) that he would submit the matter to FBC's Orlando office, who would decide. Eventually, Mr. Nickey informed her that FBC would not permit her to work after November 28, 2004. FBC has offered her no employment since, and her efforts to find work elsewhere have been unsuccessful, although she has received a total of $6,764.00 in unemployment compensation benefits.[4] Her efforts to find work included applying and interviewing with other "medical entities" in Brevard County, such as Wuesthoff Pharmacy, Melbourne Internal Medicine Associates, *246 and Wuesthoff Hospital, as well as at various retail stores, including Kohl's and Wal-Mart, the Brevard County Schools, and various agencies of the State of Florida. Neither FBC nor its insurance carrier has challenged the evidence on this point or questioned the adequacy of Ms. Arnold's job search.
But they contend she is not entitled to benefits because, they say, the only reason she was out of work was that, frustrated with how long it took to get a doctor's appointment, she rashly wrote the letter of November 17, 2004. But Mr. Nickey explained that his decision not to keep her on at FBC involved "looking at the [medically imposed, work] restrictions" she was under, which were "all kind of factored together" with the possibility she would leave on January 1, 2005, in deciding to let her go. He testified specifically that keeping her would reduce scheduling flexibility in that "the weekend position working alone . . . didn't fall within . . . the scope of her doctor's restrictions." Alternatively, FBC and its insurance carrier contend that, if Ms. Arnold's resignation letter does not bar payment of temporary partial disability benefits outright, they were entitled to impute "deemed earnings" based on amendments to section 440.15(7), Florida Statutes.[5]
The judge of compensation claims acknowledged Ms. Arnold's effort to withdraw her letter of November 17, 2004, but found "that the claimant did not express an unconditional willingness to return to work" because the letter of November 24, 2004, stated: "I feel it is in my best interest to stay at least until the new year. I would however like to ask that after the Jan. 1, 05 I be allowed to go back to my schedule of 4 days a week." Based on this language alone, the order under review found that Ms. Arnold's "express[ed] . . . willingness to return to work" should be disregarded because it was conditioned on a change in her work schedule FBC could not accommodate. These letters, although competent evidence, fall far short of proof that she left voluntarily. As purported evidence that Ms. Arnold left FBC of her own accord, the letter of November 17, 2004, is not "substantial." See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take *247 into account whatever in the record fairly detracts from its weight.").
Mr. Nickey, who testified the decision "to have November 28th be her last day" "was made primarily on my part," had no doubt that her schedule would be "extended to the first of the new year" before any possible change, if he let her keep her job. The condition she supposedly laid down had, therefore, no conceivable relevance to her continued employment "at least until the new year," i.e., for the period before January 1, 2005. Only at that point could any question of a possible schedule change become a real factor. The plainly precatory language she used ("I would . . . like to ask that . . . I be allowed. . . .") bespeaks, moreover, not an ironclad condition for her agreeing to work beyond January 1, 2005, but a request by one who well understands that the request may be denied. The judge of compensation claims never found (and the record would not support a finding) that Ms. Arnold ever refused any work (however painful) that FBC asked or permitted her to perform.
Remarkably, the order under review erroneously transformed FBC's refusal to allow Ms. Arnold to work after November 28, 2004, into a refusal to work on her part.[6] FBC had not accepted her inchoate resignation when she rescinded it. There is no evidence that Ms. Arnold actually left her employment for any reason other than FBC's refusal to allow her to remain. The order must be reversed insofar as it makes the unsupported finding that Ms. Arnold left her job with FBC without just cause attributable to FBC.
Because the analysis below did not proceed beyond the erroneous finding that Ms. Arnold left her job voluntarily, the case must be remanded for further proceedings. To be entitled to temporary partial disability benefits, "[a] claimant must show a causal connection between his or her injury and a subsequent wage loss." Interim Servs. v. Levy, 843 So.2d 915, 916 (Fla. 1st DCA 2003). "To determine whether an injury and a subsequent wage loss are causally connected, a JCC is to consider the totality of the circumstances." Id. The claimant's burden to show causation "may be met by proof which encompasses medical evidence or evidence of a good-faith work search." Nickolls v. Univ. of Fla., 606 So.2d 410, 412 (Fla. 1st DCA 1992) (applying prior version of the Workers' Compensation Act).
Having erroneously found that Ms. Arnold left FBC voluntarily, the judge of compensation claims ignored the evidence she presented regarding her medical restrictions and her six-month, unsuccessful job search in finding:
The claimant presented no testimony or evidence that her disability caused her to lose any earnings. The employer was ready, willing and able to accommodate the claimant within her physician assigned restrictions and the claimant resigned this employment. The claimant has failed to prove that her disability status resulted in a loss of earning capacity.
The order's treatment of medical restrictions and a diligent job search as anything other than "evidence that her disability *248 caused her to lose any earnings" is an unjustified departure from precedent.
Even when a disabled employee does lose a job for an extraneous reason, a good faith job search may serve as important proof that the employee is unable thereafter to find suitable employment on account of the disability. Coupled with medical restrictions, a good faith job search is not infrequently more than adequate proof of eligibility for temporary disability benefits. In Ahles, where we upheld the denial of disability benefits to an injured employee because "the reduction in the claimant's income below the minimum statutory level was caused by her termination for misconduct,[[7]] not her disability," 727 So.2d at 969, the claimant made no attempt to secure other employment and presented no medical evidence that she was unable to obtain other employment on account of her injury and the medical restrictions that resulted. For that reason, the Ahles claimant did not meet her "burden to prove that the compensable injury caused continued unemployment."[8]Id. at 971 (Benton, J., concurring) (emphasis supplied). Here Ms. Ahles put on proof both of medical restrictions and of a good faith job search.
"Since wage loss involves a periodic inquiry, [moreover, a] claimant's failure to make the required showing for one period does not preclude wage loss benefits for subsequent periods." Id. at 970 (quoting Garrick v. William Thies & Sons, 547 So.2d 232, 234 (Fla. 1st DCA 1989)).
Indemnity benefits are not automatically foreclosed when an injured employee loses a job for reasons unrelated to her injury. . . . But the claimant has the burden to prove that the compensable injury caused continued unemployment. Although no longer statutorily required as a precondition to receiving temporary indemnity benefits, an unsuccessful job search may help provide such proof.
"Whatever temporary period of unemployment might be attributable solely to unrelated dislocation would logically end upon proof of a prima facie injury connection by continued wage loss after a good faith job search by one whose employment status [capacity to earn wages] has been . . . altered by a compensable impairment which affects his competitive position in the labor market." Whalen v. U.S. Elevator, 486 So.2d 670, 671 (Fla. 1st DCA 1986).
Id. at 971 (alteration in original) (citations omitted). Here, there was uncontroverted *249 evidence that an authorized treating physician placed her on work restrictions because of her on-the-job injury, and that she tried to find work over a period of months, diligently but not successfully.
On remand, the judge of compensation claims should consider all relevant evidence, including evidence of work restrictions and Ms. Arnold's job search, in ascertaining her entitlement to the temporary partial disability benefits she seeks. As the claimant concedes, FBC is entitled to offset the unemployment compensation benefits that Ms. Arnold has already received against any award of temporary partial disability benefits.
Reversed and remanded.
PADOVANO and LEWIS, JJ., concur.
NOTES
[1] For this reason, section 440.15(6), Florida Statutes (2004), does not apply in the present case.

(6) EMPLOYEE REFUSES EMPLOYMENT.If an injured employee refuses employment suitable to the capacity thereof, offered to or procured therefor, such employee shall not be entitled to any compensation at any time during the continuance of such refusal unless at any time in the opinion of the judge of compensation claims such refusal is justifiable.
§ 440.15(6), Fla. Stat. (2004) (emphasis supplied). FBC and its insurance carrier do not contend that section 440.15(6) applies here.
[2] See generally § 440.15(7), Fla. Stat. (2004) (providing that "temporary partial benefits shall be payable based on the deemed earnings of the employee as if she or he had remained employed" if an "employee leaves her or his employment while receiving temporary partial benefits without just cause as determined by the judge of compensation claims"). Ms. Arnold never actually received temporary partial (or any other disability) benefits.
[3] There was testimony that, after she saw Dr. Cooper, "[h]er coworkers . . . [k]new of her limitations and were asked to assist her." For the final four days of her employment, however, she continued to work her regular shift, and the last two days of her employmenta Saturday and Sundayshe worked by herself with no assistance from any coworkers.
[4] She received benefits after she lost her job at FBC to which she was legally entitled only if FBC discharged her or if she had good cause under the unemployment compensation statute in leaving. See § 443.101(2), Fla. Stat. (2004) ("An individual shall be disqualified for [unemployment compensation] benefits: . . . [i]f the [agency] finds that the individual has failed without good cause . . . to accept suitable work when offered to . . . her. . . . ").
[5] Since October 1, 2003, see ch.2003-412, § 18, at 3926-27, Laws of Fla., section 440.15(7) has provided:

(7) EMPLOYEE LEAVES EMPLOYMENT.If an injured employee, when receiving compensation for temporary partial disability, leaves the employment of the employer by whom she or he was employed at the time of the accident for which such compensation is being paid, the employee shall, upon securing employment elsewhere, give to such former employer an affidavit in writing containing the name of her or his new employer, the place of employment, and the amount of wages being received at such new employment; and, until she or he gives such affidavit, the compensation for temporary partial disability will cease. The employer by whom such employee was employed at the time of the accident for which such compensation is being paid may also at any time demand of such employee an additional affidavit in writing containing the name of her or his employer, the place of her or his employment, and the amount of wages she or he is receiving; and if the employee, upon such demand, fails or refuses to make and furnish such affidavit, her or his right to compensation for temporary partial disability shall cease until such affidavit is made and furnished. If the employee leaves her or his employment while receiving temporary partial benefits without just cause as determined by the judge of compensation claims, temporary partial benefits shall be payable based on the deemed earnings of the employee as if she or he had remained employed.
§ 440.15(7), Fla. Stat. (2004) (emphasis supplied). Deeming earnings in the present case would preclude an award of temporary partial disability benefits.
[6] The determination in the order under review that Ms. Arnold "failed to prove that her disability status resulted in a loss of earning capacity" and "failed to satisfy her burden of proving a causal connection between her work related injury and her resulting wage loss" hinges on this erroneous, unsupported finding. Evidence of work restrictions that "factored into" the loss of her job with FBC and of her extensive search for employment elsewhere went unrebutted.
[7] In Ahles, the misconduct was theft. The same principle has been applied to other misconduct:

Workers' compensation benefits are not precluded merely because some portion of the wage loss is attributable to a reason unrelated to the injury. . . . Even [where] a claimant [is] terminated from his or her employment for insubordination, the claimant may still be entitled to benefits if he or she satisfies the burden of demonstrating that the injury contributed to the wage loss after the termination.
Stewart v. CRS Rinker Materials Corp., 855 So.2d 1173, 1177 (Fla. 1st DCA 2003). But see Ch.2003-412, § 18, at 3925, Laws of Fla. (adding to section 440.15(4)(e), Florida Statutes, effective October 1, 2003: "If the employee is terminated from post injury employment based on the employee's misconduct, temporary partial disability benefits are not payable as provided for in this section.").
Nobody suggests that Ms. Arnold was guilty of misconduct of any kind.
[8] Even if the claimant in Ahles had presented evidence of a job search, the record would have supported a finding that the theftthe cause of the termination of her employmentnot her compensable injury, prevented her from securing new employment and caused her continuing unemployment. Vencor Hosp. v. Ahles, 727 So.2d 968, 968 (Fla. 1st DCA 1998).