63 A.3d 609

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

v.

## Robert M. WASHINGTON.

### No. 0769, Sept. Term, 2011.

Court of Special Appeals of Maryland.

March 21, 2013.

Gerard Stief (Carol B. O'Keeffe, Gen. Counsel, Mark F. Sullivan, Donna J. Henderson, on the brief) Washington, DC, for appellant.

Benjamin T. Boscolo (Chasen Boscolo Injury Lawyers, on the brief) Greenbelt, MD, for appellee.

Panel: ZARNOCH, KEHOE, J. FREDERICK SHARER, (Retired, Specially Assigned), JJ.

ZARNOCH, J.

In this case, the employer/appellant, Washington Metropolitan Area Transit Authority ("WMATA"), appeals a judgment from the Circuit Court for Prince George's County in favor of the employee/claimant, appellee, Robert Washington ("Washington") stemming from a jury finding that he sustained a 64 percent disability and industrial loss of use as a result of an accident arising out of and in the course of his employment. Clouding that award, WMATA says, are evidentiary problems regarding Washington's post-injury termination and his earnings from his private business. For the following reasons, we agree, in part, with WMATA and reverse and remand for further proceedings.

## FACTS AND LEGAL PROCEEDINGS

On August 24, 2005, while working as a train operator with WMATA, Washington sustained an accidental injury when he slipped and fell at the train station, injuring the right side of his lower back. At the time of the injury, Washington was also operating Tilly's Limousine Incorporated ("Tilly's"), a stretch limousine company he formed in 2004.[1]

Immediately after hurting his back, Washington was taken to the emergency room at Fort Washington Hospital, where he received medical treatment and was prescribed physical therapy, which he engaged in for approximately two months. He filed a workers' compensation claim, and he was off work until November 17, 2005, when he returned to WMATA as a train operator.[2]

On that day, Washington filed another injury report due to a malfunctioning seat, which, he asserted, caused pain to his

---

1. Although Tilly's was established in 2004 and purchased its first limousine in January 2005, it did not finally receive the limousine until nearly one year later because the vehicle had previously been damaged in delivery.

2. The record is unclear as to the nature and extent of workers' compensation payments for this period.

lower back. He joined this incident with his August 2005 injury, and filed a consolidated claim.

In early and mid–2006, the Workers' Compensation Commission (the "Commission") held several hearings to address Washington's consolidated claim, resulting in a "directive to pay or in an affirmation of the parties' agreement to pay temporary-total-disability benefits." Then, Washington began working on a light duty basis as a parking lot inspector, which required him to constantly drive a car, look for suspicious activity in parking lots, and report back to WMATA.

In the summer of 2006, Washington asked the Commissioner and WMATA to return him to work as a bus operator.[3] In response, WMATA sent Washington to a "work hardening" program[4] in August 2006 with the expectation of having him return as a bus operator. After about one year, Washington increased his work tolerance to eight hours per day and was able to sit for 35 minutes without pain.

In June 2007, Washington stopped receiving temporary-total-disability payments. Washington protested this discontinuance and filed a claim to restore payments, which the Commission heard on August 13, 2007. When questioned about his ability to work, Washington testified without equivocation that he did not work two days prior to the hearing. WMATA then played footage from videotape surveillance that showed Washington working as a limousine driver for Tilly's during the time he had denied working. Upon receiving this evidence and ascertaining from Washington that he owned the

---

3. Washington was apparently still receiving workers' compensation benefits during this time, and requested that he be allowed to "go back to being a bus operator" because he was "sick and tired of Worker's Comp ... [and] just wanted to go back to work."

4. "Work hardening" is a "rehabilitation program designed to restore functional and work capacities to the injured worker through application of graded work simulation." *Miller–Keane Encyclopedia and Dictionary of Medicine, Nursing and Allied Health* (7th Ed.2003). The goal "of work hardening is to achieve an acceptable level of productivity for returning to one's former occupation or for meeting the demands of a specific new type of work." *Id.*

limousine service business, the Commission ruled against Washington.

Shortly thereafter, a WMATA superintendent interviewed Washington and discharged him on August 22, 2007 on the grounds of "false representations [made] in order to obtain [workers' compensation] benefits...." Subsequent to his termination, Washington stopped receiving work hardening and other medical treatment. Washington then pursued the grievance process under the collective bargaining agreement with his union. The grievance was resolved in favor of WMATA on February 9, 2009.

On October 28, 2009, the Commission held a hearing in connection with Washington's claim for permanent partial disability. After reviewing the evidence and the findings of the parties' expert witnesses, the Commission concluded on November 6, 2011 that Washington suffered a permanent partial disability "amounting to 22% industrial loss of use of the body as the result of an injury to the back...." Dissatisfied with this award, Washington subsequently filed a petition for judicial review in the Circuit Court for Prince George's County. WMATA did not challenge the award.

Prior to trial, WMATA moved unsuccessfully to exclude all evidence Washington planned to present concerning his past and current income as the owner of Tilly's and his past or present loss of income resulting from his termination of employment with WMATA. WMATA argued that evidence of Washington's wage differential was irrelevant, because the wage loss did not occur as a result of the accidental injury, but instead was caused by Washington's fraudulent statements to the Commission. In addition, the employer contended that even if the evidence of wage loss was relevant, "it is very misleading," because "the jury may decide to punish WMATA for terminating him or to give him a permanent rating that is the equivalent of having his WMATA job."[5] Nevertheless,

---

5. WMATA's "pre-trial statement" described the basis for its motion as follows:

the court denied the motion, concluding that it would instead give a jury instruction at the close of evidence that Washington was terminated from WMATA for cause.

A jury trial began on March 22, 2011. During opening statements, Washington's counsel asked the jury to award Washington a 75 percent industrial loss of use rating based on the following wage depression:

> [W]hen Mr. Washington was working as a train operator, he was earning about thirteen hundred and some odd dollars a week. And you are going to hear that as he operates Tillys right now, he's making about fourteen hundred and fifteen dollars a month. And what he's making per month is basically, he pays for the mortgage that he [and his wife] live in out of the business which he runs out of his house. That's the only benefits right now he's getting. He presently owns four limousines,[6] has a few drivers, hasn't turned a profit. The only benefit is saving the house.

Counsel continued:

> If you do believe Mr. Washington, then the only evidence you are going to have is going to show you that he's lost 75 percent. Because when you compare $364 a week he's making now at Tillys to the $1333.00 per week he was making as a train operator for WMATA, you are going to see that's about 25 percent of what he used to make before he lost his job . . . and that's where we think the evidence will show you the answer to the question are you going to be presented is 75 percent.

---

WMATA moves to limit any and all evidence on Claimant's post-injury wages because he was found to be operating his limousine service and because he was returned to full duty as a rail operator by WMATA's doctors and as a bus operator by his own physicians. He could have returned to full duty but for his termination from employment. Any evidence concerning post-injury wages is prejudicial and not relevant to his loss of industrial use in his back. It is not for the jury to determine whether his termination was proper or not. Claimant was afforded all the protections of his union contract and his grievance was denied by the arbitrator.

**6.** Washington later testified that he presently had five limousines.

Both parties presented videotaped depositions of two medical experts, which were conflicting. Washington's expert, Dr. Michael Franchetti, opined that Washington had reached maximum medical improvement and had suffered a 28 percent "whole person impairment." According to Franchetti, Washington's work injury prevented him from participating "in any activities that involve bending or twisting of his back, and that he should not sit or drive more than 35 minutes without a change of position." Dr. Philip Schneider, WMATA's expert, concluded that Washington was impaired at the level of 15 percent of his body as a whole, but that there was nothing "in particular" that would have limited Washington from returning to work as a train operator.

Washington testified that his back felt like his body was deteriorating, and he could not walk, exercise, or bowl as frequently as he could before the injuries, and that he constantly felt like there was a "fist pressing up against" his back. Washington stated that, since losing his job at WMATA, he had not "done a lot of looking" for another job, but instead worked for Tilly's, where he hired others to drive, "occasionally" drove, and performed clerical work.[7] He testified the business operated at a loss every year since its incorporation, and that he only withdrew the funds necessary to make his monthly mortgage payment, which amounted to $1415.00 per month. With respect to the remainder of the revenue generated at Tilly's Washington testified: "I pay $7,000 right now in limousine notes. I pay [$1,258.00] insurance for each vehicle, for all the vehicles a month."

During cross-examination, counsel elicited the following testimony concerning Tilly's limousine business: in 2007 and 2008, Washington purchased some limousines with funds from a loan from his relatives, that he had recently received another loan for $10,000.00, and that he paid back the loans in monthly installments of $1540.00. He also confirmed that he wrote off

---

7. The limousine business principally involved driving for funerals and weddings.

$212,245.00 on his 2008 income tax returns because of limousine purchases.

During closing arguments, Washington's counsel focused on Washington's wage loss from his termination from WMATA, arguing over objection that "[w]age loss is the strongest evidence of disability ... [t]hat's why [Washington's] employment with Tilly's is so important." According to his counsel, in the six years since his termination from WMATA, Washington was now earning 25 percent of what he was earning as a train operator. He urged the jury to award Washington 75 percent permanent partial disability, representing the difference between Washington's WMATA wages and his earnings from Tilly's:

> I will end with where I started. Where is this 75 percent coming from? How can it be 75 percent when he owns and operates a business? Here is how ... Mr. Washington now earns $1415 a month [$16,908 per year] ... All he has ever made is what he used to pay his mortgage. Gee, wouldn't he like to have that $67,000 a year he was earning as a train operator to help keep that business going to build it up ... If you compare [what] Mr. Washington is now earning in 2007, six years after the injury, 25 percent of what he was earning as a train operator. What has he lost? The difference between 100 percent and 25 percent. Not a number Mr. Washington picked out of the air. It's a number that is his best indication of how this injury has affected his ability to earn wages.

In WMATA's closing argument, its counsel noted:

> Why doesn't [Washington] have the wages anymore? He doesn't have the wages anymore because he was terminated from the Authority.

*     *     *

> We see an individual who got fired from his job, and from WMATA's perspective rightfully so, then he has asked you to use his old wages to compare it to the current job that he got, has, his own business, where he is pouring the profits from the business into more vehicles.

With regard to the $1303 per week he was making at Metro. He lost that on his own accord, because of his own decision to lie on the stand, because of his own decision to submit temporary total disability certificates to Metro when in fact he wasn't totally disabled. He asks you to compare that to his limo business in which he is pouring all the profits back into the business. It seems to me that both of these numbers are seriously flawed, seriously flawed.

So I submit to you that the 22 percent arrived at by the Maryland Workers' Compensation Commission is fair and reasonable for the injury that he sustained.

After deliberations, the jury returned a verdict in favor of Washington, concluding that he had sustained a 64 percent disability and industrial loss of use resulting from the 2005 injury to his back. In addition, the jury verdict form reflects its conclusion that this percentage was not "the result of the loss of his job with" WMATA.[8] WMATA moved for remittitur and a new trial, which was denied on May 5, 2011.[9] On June 6, 2011, the circuit court entered an order vacating the Commission's November 6, 2011 award of 22 percent industrial loss use, and remanded the case for issuance of an award of 64 percent permanent partial disability. WMATA noted this appeal.

## QUESTIONS PRESENTED

WMATA presents three questions for review:

1.  Whether the trial court erred in permitting Claimant to introduce evidence of his pre-injury wages at WMATA and speculative evidence regarding earnings from his startup limousine business to prove industrial loss of use where WMATA terminated Claimant as a result of his

---

8. Although the record is somewhat unclear, apparently WMATA was the source of this question.

9. In its motion, WMATA argued that the jury verdict was "grossly excessive" and that the result was contrary to the weight of the evidence and "irreconcilably inconsistent." In this appeal, the employer's questions presented do not encompass these issues.

misrepresentations before the Maryland Workers' Compensation Commission?

2. Whether, in the absence of properly admitted evidence regarding Claimant's wages from WMATA or earnings from his start-up limousine business, Claimant presented sufficient evidence to support the jury's award of 64 percent industrial loss of use in light of the Commissioner's award of 22 percent? [10]

3. Whether the trial court erred in denying WMATA's objection, and sustaining the verdict, where Claimant had the burden of proof and failed to present vocational expert testimony or other sufficient evidence to establish loss of earning capacity in light of his termination for cause from WMATA? [11]

Focusing in part on question one, we reverse the circuit court decision and remand the case for a new trial. In light of this disposition, we need not address the other issues presented by WMATA.

## DISCUSSION

### A. Introduction

The touchstone of the workers' compensation system is an industrial injury which results in an occupational disability or death. *Queen v. Agger*, 287 Md. 342, 343, 412 A.2d 733 (1980). A permanent partial disability is one that is "permanent in duration and partial in extent." *Wal Mart Stores, Inc. v. Holmes*, 416 Md. 346, 354 n. 2 (2010). Unlike payments for temporary disability, compensation awards for permanent disability are "not based solely on loss of wages, but [are] based

---

10. WMATA made no motion for judgment under Md. Rule 2–519 on the basis of sufficiency of the evidence. Thus, to the extent the employer raises a sufficiency question rather than an evidentiary one, this issue has been waived.

11. Washington frames the issue more narrowly:

Did relevant evidence support the jury's determination that Mr. Washington suffered a 64% industrial loss of use of the body as a result of the August 24, 2005 work accident?

on actual incapacity to perform the tasks usually encountered in one's employment, and on physical impairment of the body that may or may not be incapacitating." *Queen v. Queen,* 308 Md. 574, 585–86, 521 A.2d 320 (1987).

■ As Professor Larson has observed, the "disability concept is a blend of two ingredients[:] ... disability in the medical or physical sense ... [and] the *de facto* inability to earn wages." 4 *Larson's Workers' Compensation Law* (MB) § 80.02 (2007). Thus, the test used to determine the degree of disability is whether a claimant's injuries allow him to return to and adequately perform his prior job with the employer, and whether the workplace injury caused a reduction of wages. *Getson v. WM Bancorp,* 346 Md. 48, 62, 694 A.2d 961 (1997) (For compensability, "[t]he Commission must do more than merely adopt medical evaluations of anatomical impairment; the Commission must assess the extent of the loss of use by considering how the injury has affected the employee's ability to do his or her job").

In Maryland, permanent disability payments for unscheduled "Other Cases" are calculated by an evaluation of the factors set forth in Md.Code (1999, 2008 Repl.Vol.), Labor and Employment Article ("Lab. & Empl.") § 9–627(k)(1)–(2):

> (1) In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the industrial use of the covered employee's body was impaired *as a result of the accidental personal injury or occupational disease.*
>
> (2) In making [an industrial use of loss] determination ... the Commission shall consider factors including:
>
> > (i) the nature of the physical disability; and
> >
> > (ii) the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred.

(Emphasis added).

## B. Standard of Review

■ Md. Rule 5–402, governing the admissibility of relevant or irrelevant evidence, provides: "Except as otherwise provid-

ed by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible." Thus, although a trial court has "wide discretion" in weighing the relevance of evidence, it does not have discretion to admit irrelevant evidence. *Id.; State v. Simms*, 420 Md. 705, 724, 25 A.3d 144 (2011).

■■ In evaluating the correctness of the trial court's ruling, we engage in a two-pronged analysis. First, we consider whether the evidence is legally relevant, a conclusion of law which we review *de novo*. *Simms*, 420 Md. at 725, 25 A.3d 144. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5–401. If we conclude that the challenged evidence meets this definition, we then determine whether the court nonetheless abused its discretion by admitting relevant evidence which should have been excluded because its "probative value is outweighed by the danger of unfair prejudice, or other countervailing concerns as outlined in Maryland Rule 5–403." *Simms*, 420 Md. at 725, 25 A.3d 144.

## C. WMATA'S Contentions

WMATA asserts that the trial court erred in denying its motion *in limine* and permitting Washington to introduce evidence of his pre-injury income with WMATA and his post-injury earnings from his personal business, Tilly's. Specifically, WMATA argues that the claimant's loss of earnings was caused by his termination for making false statements, not his work injury.[12] The employer contends that this earnings evidence was irrelevant and unfairly prejudicial, as it did not tend to prove loss of earning capacity caused by an accidental work injury.

---

12. WMATA's motion in limine was not aimed at preventing the jury from knowing about Washington's termination—a fact the employer trumpeted. *See* pp. 447–48, 63 A.3d at 614–15, *supra.*

Before addressing these contentions, we note that the propositions jumbled in WMATA's first assignment of error, to a large degree, touch on questions litigated in other jurisdictions (although in a more direct and more orthodox fashion). However, these issues have not been finally resolved in Maryland. We find though that separating out the components of the questions and their premises makes our task easier.

## D.  The Impact of Washington's Termination

As a basis for excluding evidence of Washington's pre-injury WMATA income, the employer cites in its brief a number of out-of-state decisions for the proposition that an employee fired for misconduct has voluntarily removed himself from the workforce and is not entitled to wage loss benefits.[13] *See Robinson v. D.C. Dep't of Empl. Servs.*, 824 A.2d 962, 964–65 (D.C.2003)[14]; *Ucci v. Hathaway Bakeries, Inc.*, 75 R.I. 341, 66 A.2d 433, 436–37 (1949); *Montalbano v. Richmond Ford, LLC*, 57 Va.App. 235, 701 S.E.2d 72 (2010). However, at least one state appellate court has concluded that "it appears that the majority of jurisdictions reject this rule." *Hudson v. Horseshoe Club Operating Co.*, 112 Nev. 446, 916 P.2d 786, 791 (1996).[15]

In *Arizona Dep't of Pub. Safety v. Industrial Comm'n*, 176 Ariz. 318, 861 P.2d 603 (1993), the Arizona Supreme Court said:

> [W]e fail to see the wisdom in holding that an employee who loses a post-injury job because of misconduct voluntarily

---

13.  Unlike these cases, WMATA does not argue that Washington is not entitled to any wage loss benefits. The employer did not seek judicial review of the Commission's finding of 22 percent industrial loss of use, *see* pp. 444–45, 63 A.3d at 612–13, *supra*, and urged the jury to uphold the Commission's level of compensation. *See* pp. 447–48, 63 A.3d at 614–15, *supra*.

14.  WMATA also cites *Baliles v. D.C. Dep't of Empl. Servs.*, 728 A.2d 661, 665 (D.C.1999) for the proposition that "voluntary retirement bars disability benefits when [the] retirement was not related to [the] work injury."

15.  Many of the cases on both sides of the ledger are temporary, not permanent, disability cases.

forfeits benefits for a loss of earning capacity which, depending on the nature and extent of disability, may be quite profound.

*Id.* at 608.

The appellate court went on to note:

Misconduct should be—and is—irrelevant except as it pertains to ... causation.... Payment of benefits does not depend on a claimant's good moral character, but is based simply on an injury within the scope of the workers' compensation statutes.

Termination reasons unrelated to the industrial injury, such as layoff, strike, economic conditions, or misconduct become significant only *where the evidence demonstrates* that they, rather than claimant's disability, caused the subsequent inability to secure work.

*Id.* (Emphasis added). (Citations omitted). The Minnesota Supreme Court has similarly observed:

[A] justifiable discharge for misconduct suspends an injured employee's right to wage loss benefits; but the suspension of entitlement to wage loss benefits will be lifted once it has become demonstrable that the employee's work-related disability is the cause of the employee's inability to find or hold new employment. *Such a determination should be made upon consideration of the totality of the circumstances* including the usual work search "requirements."

*Marsolek v. George A. Hormel Co.,* 438 N.W.2d 922, 924 (Minn.1989). (Emphasis added). *See also PDM Molding, Inc. v. Stanberg,* 898 P.2d 542, 547 n. 4 (Colo.1995) ("[T]erminating an employee for fault does not automatically bar an award of temporary total disability benefits ...."), *superseded by statute,* Colo.Rev.Stat. § 8–42–105 (2012); *Johnson Controls, Inc. v. Fields,* 758 A.2d 506, 509 (Del.2000) ("To permit the employer to claim a forfeiture of compensation through its disciplinary process works a deprivation of benefits already fixed at the time of injury."); *Stewart v. CRS Rinker Materials Corp.,* 855 So.2d 1173, 1178, (Fla.Dist.Ct.App.2003) (Once it has been determined that the "claimant had been terminated,

the question then [becomes] whether claimant [has] satisfied his burden of showing a causal connection between his injury and loss of earning capacity after his termination.").[16]

In our view, Maryland cases point in this direction. In *Victor v. Proctor & Gamble Mfg. Co.*, 318 Md. 624, 569 A.2d 697 (1990), the Court of Appeals rejected an employer's contention that an employee's voluntary retirement impeded his earning capacity, not his accidental injury.[17] The Court noted that "[g]iven that disability envisions diminished earning capacity and not actual loss of wages *per se*, it follows that Victor's voluntary retirement from his job at Proctor & Gamble had no effect whatsoever on his entitlement to compensation for temporary total disability." *Id.* at 632, 569 A.2d 697. Similarly, in *Bowen v. Smith*, 342 Md. 449, 677 A.2d 81 (1996), the Court upheld an award of temporary total disability benefits to a claimant who had been incarcerated after he was injured. The Court observed that "like voluntary retirement, incarceration does not cause a claimant's injury nor cause the claimant to become disabled. The award of compensation, based on a finding of total disability, is not affected by claimant's subsequent incarceration." *Id.* at 458, 677 A.2d 81.

It is no great leap to conclude from these cases that an employee's termination would not automatically bar benefits if the claimant's evidence demonstrated that his or her disability caused the subsequent inability to find work. *See* pp. 453–54, 63 A.3d at 617–18, *supra.* WMATA emphasizes the fact that Washington was terminated for lying in order to obtain benefits. While such misconduct is not to be condoned, it is noteworthy that the General Assembly has barred compensation only for an employee who is *convicted* of knowingly

---

16. *See also* 1–13 *Employment Law Deskbook* § 13.03(MB) (2012) (An employer's "defense of misconduct is difficult to sustain because it runs counter to the public policy that employee fault generally should not bar worker's compensation recovery.")

17. Victor had been awarded temporary total disability and later was granted a supplemental award for permanent partial disability. 318 Md. at 626, 569 A.2d 697. Shortly before the award for permanent partial disability, he voluntarily retired. *Id.*

affecting or attempting to affect the payment of workers' compensation by means of a fraudulent representation. Lab. & Empl. § 9–1106. *See Kelly v. Consol. Delivery Co.,* 166 Md.App. 178, 188, 887 A.2d 682 (2005) ("The [Workers Compensation] Commission does not have authority to or jurisdiction to 'convict' a person of violating LE § 9–1106(a); only a court may do so.").

Finally, it is hard to see how WMATA was prejudiced by the denial of this component of its motion *in limine.* The employer apparently requested and obtained a special verdict on the issue of whether the percentage of disability and incidental loss was the result of the loss of Washington's job with WMATA—a question the jury answered in the negative.

For all of these reasons, we conclude that the circuit court did not err in declining to exclude evidence of Washington's pre-injury earnings with WMATA solely because he had been terminated from his position.

### E. Impact of Washington's Income from Private Business

█ We now turn to WMATA's unsuccessful attempt to exclude evidence of Washington's past and current income as the owner of Tilly's. Here, WMATA is on more solid ground.

█ According to relevant authorities, the general rule is that profits derived from a business are not to be considered as earnings and cannot be accepted as a measure of loss of earning power unless they are almost entirely the direct result of the claimant's personal management and endeavors.[18] *See* Larson, *supra* at § 83.05; 82 Am.Jur.2d *Workers' Compensation* (2005) at § 435; and *Washington Post v. District of*

---

18. We focus exclusively on an injured employee's private business endeavors not his post-injury earnings as an employee. *See Ralph v. Sears Roebuck & Co.,* 102 Md.App. 387, 396, 649 A.2d 1179 (1994), *aff'd.* 340 Md. 304, 666 A.2d 1239 (1995) (Post-injury earnings of the injured employee is one of several factors which a trier of fact may consider in deciding the amount of loss of individual use in a permanent partial disability case); *Buckler v. Willett Constr. Co.,* 345 Md. 350, 692 A.2d 449 (1997) (Employee is not entitled to temporary total disability benefits because he continued to work at a second job.)

*Columbia Dep't of Empl. Svcs.*, 675 A.2d 37, 42 (D.C.1996).[19] The admission over WMATA's objection of evidence of Washington's earnings from Tilly's runs afoul of this rule. Nor is the relevance of this business income enhanced by the limited exception recognized in the caselaw. The record here is clear that Washington's profits were not "almost entirely" the result of his "personal endeavors." Although the claimant on occasions drove a limousine himself, with five vehicles, he obviously employed other drivers. Finally, given the persistent references at trial to the limousine income by Washington's counsel, *see* pp. 445–46 and 447, 63 A.3d at 613 and 614, and the otherwise inexplicable size of the verdict, WMATA was clearly prejudiced by the jury's consideration of this evidence.

For these reasons, it is our view that the circuit court erred in not granting WMATA's motion *in limine* and in allowing testimony regarding Washington's business income.[20]

Thus, we remand for a new trial.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE EVENLY DIVIDED BETWEEN THE PARTIES.

---

**19.** Unlike this case, where the employer is seeking to exclude relatively modest private business profits from the equation, typically the employer, as in the *Washington Post* case, is the one trying to present such evidence, usually in an attempt to show that the employee's earnings from the business exceeded his lost wages. 675 A.2d at 42.

**20.** Because we reverse the circuit court on this basis, we need not consider WMATA's assertions with respect to Washington's alleged understatement of his business earnings.