REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1832

September Term, 2012

GARY JAMES SMITH

v.

STATE OF MARYLAND

Kehoe,
Hotten,
Nazarian,

JJ.

Opinion by Nazarian, J.

Filed: August 28, 2014

During *voir dire*, counsel for Gary Smith asked the Circuit Court for Montgomery County to include a mandatory Defense-Witness question to the jury panel. The court did not ask the question, but as the court and parties recapped the questions after the court read them, the prosecutor told the court that it had in fact asked it, and Mr. Smith's counsel did not correct him. The State agrees with Mr. Smith that under *Moore v. State*, 412 Md. 635 (2010), the failure to ask the mandatory Defense-Witness question requires us to reverse his convictions for involuntary manslaughter and use of a handgun in the commission of a felony. The State argues nevertheless that defense counsel's failure to correct the prosecutor's misstatement to the court "invited" the error, and thus Mr. Smith failed to preserve it. We disagree with the State and reverse, and we address two other issues that are likely to recur on remand.

## I. BACKGROUND

This appeal represents the latest chapter in a case that started on September 26, 2006 with the shooting death of Army Ranger Michael McQueen, Mr. Smith's then-roommate. Mr. Smith was tried and convicted once before, but the Court of Appeals reversed Mr. Smith's original convictions for depraved heart second-degree murder and use of a handgun in the commission of a felony. *See Smith v. State*, 423 Md. 573 (2011). This appeal arises from his second trial.

Between 12:00 and 1:00 a.m. on September 26, 2006, police responded to a 911 call by Mr. Smith and found him outside of the apartment he shared with Mr. McQueen. When the police arrived at the apartment, Mr. Smith was in hysterics, sitting on the sidewalk curb

and covered in blood.  Inside the apartment, the police found Mr. McQueen in the living room, dead from a gunshot wound to the right side of his head.  His body was sitting in a chair facing a television, with a marijuana grinder in his lap and a bottle of beer, a bong, and a remote control on the floor next to the chair.  Police did not find a gun next to the chair or anywhere else in the apartment.[1]

Police took Mr. Smith into custody and began questioning him at approximately 3:30 a.m.  During the interrogation, Mr. Smith accounted for his contact with Mr. McQueen over the course of the evening.  The pair began the evening by smoking marijuana in their apartment before going to several bars and consuming multiple alcoholic beverages.  Mr. Smith then gave three different versions of the events that transpired after he and Mr. McQueen left the bars.

In the first version, Mr. Smith dropped Mr. McQueen off at the apartment before driving to his mother's house to pick up some clothes.  Upon returning, Mr. Smith said he found Mr. McQueen dead in the chair and dialed 911.  Mr. Smith alluded to some potential suspects and stated that he did not keep any weapons in the apartment.[2]

In the second version of events, Mr. Smith described how he came home from his mother's house to find Mr. McQueen dead with a .38 gun on the floor next to his hand.  Mr.

---

[1] A search of the apartment produced a bag containing multiple live rounds of ammunition in one of the bedrooms.

[2] He did, however, describe a cache of firearms that he owned and kept at his mother's house.

2

Smith testified that he owned the gun and realized that his fingerprints would be on the gun and ammunition. Mr. Smith said that he panicked, took the gun, and threw it away in a nearby lake. After disposing of the weapon, he returned to the apartment and called the police.

After the interrogating officers pressed Mr. Smith regarding inconsistencies in his stories, Mr. Smith offered a third version. This time, Mr. Smith said that he had put the .38 inside the laundry basket at his mother's house, then went back to his apartment. Mr. McQueen was watching television, and Mr. Smith then took the gun out of the laundry basket and placed it on the floor, warning him that the gun was loaded. Mr. Smith proceeded to use the back bathroom in the rear of the apartment; as he was exiting the bathroom, he heard a gunshot and came out to see blood coming out of Mr. McQueen's head. Upon seeing the body, Mr. Smith grabbed the gun and threw it away in the nearby lake, then returned to the apartment and called the police.

Mr. Smith was convicted at trial for depraved heart second-degree murder and use of a handgun in the commission of a felony, but the Court of Appeals reversed the conviction and remanded the case for a new trial. The second trial began on August 30, 2012 and lasted through September 17, 2012. The main issue at trial was whether Mr. McQueen's death was a homicide or suicide, and both the State and Mr. Smith presented a large amount of witnesses and evidence in support of their respective theories. The jury convicted Mr. Smith

3

of involuntary manslaughter and use of a handgun in the commission of a felony on September 19, 2012. Mr. Smith filed a timely appeal.

## II. DISCUSSION

Mr. Smith raises six issues on appeal, but our resolution of the first limits the number we need to address.[3] We hold that the trial court's failure to ask the Defense-Witness question during *voir dire* requires us to reverse Mr. Smith's convictions. Additionally, and

---

[3] The following Questions Presented, as phrased by Mr. Smith, were presented in this appeal:

1. Did the trial court err when it refused to ask the mandatory Defense-witness and State-Witness questions, during *voir dire* of prospective jurors?

2. After a jury note on the subject, did the trial court err or abuse its discretion in refusing to give the requested supplemental jury instruction defining "use" of a handgun in the commission of a felony?

3. Was it error or an abuse of discretion to refuse to allow the U.S. Army's chief psychiatrist at Walter Reed Hospital to testify regarding suicide statistics and general suicidology, among Army veterans of the wars in Iraq and Afghanistan?

4. Did the trial court err or abuse its discretion in increasing Appellant's sentence, upon retrial?

5. Was it error or an abuse of discretion to refuse to make certain redactions to the recording of Appellant's interrogation?

6. Was it error to admit testimony and other evidence in violation of Maryland Rule 5-404(b)?

4

to guide the circuit court on remand, we hold that the trial court erred in admitting the unfairly prejudicial gun ownership and ammunition bag evidence, but we find no abuse of discretion in the court's decision to admit testimony regarding a witness's prior encounter with Mr. Smith.

### A. The Trial Judge Committed Reversible Error When It Refused To Ask The Defense-Witness *Voir Dire* Question.

Mr. Smith begins by arguing that the trial judge committed reversible error by refusing to ask his Defense-Witness *voir dire* question. The State does not dispute that the question was mandatory, that Mr. Smith asked the court to ask it, or that omitting the question normally requires reversal. Instead, the State argues that Mr. Smith waived any complaint about the omission by "inviting" the court's error when defense counsel did not catch and correct the *State's* misstatement to the court. We decline to hold defense counsel responsible for the State's mistake.

Under Maryland law, "if a question is 'directed to a specific cause for disqualification' then the question must be asked and failure to do so is an 'abuse of discretion.'" *Moore v. State*, 412 Md. 635, 654 (2012) (quoting *Casey v. Roman Catholic Archbishop of Balt.*, 217 Md. 595, 605 (1958)). An abuse of discretion in this context is reversible error. *Id.* at 668 (citations omitted). During *voir dire*, Mr. Smith asked the court to ask the following question (the "Defense-Witness question") designed to identify jurors who might harbor a bias against defense witnesses:

5

> Is there any member of the panel who would be less likely to believe a witness simply because they were called by the defense?

The trial judge omitted this question from *voir dire* intentionally, and for two reasons: because "the issue in the question was . . . raised by another question" and because the court "found the question to be inappropriate for voir dire." Following *voir dire*, the court asked the parties to make any objections they had concerning omitted *voir dire* questions. Counsel for Mr. Smith then identified different omitted *voir dire* questions with which he took issue. In response to each question, the trial judge stated whether he had asked the question or explained his reasoning for why he did not.

Among these objections, Mr. Smith expressly challenged the omission of the Defense-Witness *voir dire* question:

> [COUNSEL FOR MR. SMITH]: And then [the Defense-Witness *voir dire* question].
>
> [COUNSEL FOR THE STATE]: You've already asked that question. If you'll believe the credibility equally on both sides.
>
> THE COURT: That issue has been covered, just different words[.]

After Mr. Smith went through all of the questions whose omission he challenged, the Court proceeded to swear the prospective jurors into the jury. The trial judge asked the defense three times whether it was satisfied with the jury; each time, counsel for Mr. Smith expressed satisfaction qualified by the exceptions he had made at the bench.

6

Maryland Rule 4-323(c) governs the "manner of objections during jury selection," including objections made during *voir dire*. *Marquardt v. State* 164 Md. App. 95, 142 (2005) (citing *Baker v. State*, 157 Md. App. 600, 609, 610 (2004); *Newman v. State*, 156 Md. App. 20, 50-51 (2003), *rev'd on other grounds*, 384 Md. 285 (2004)). In order to object to a trial court ruling made during *voir dire*,

> it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court.

Md. Rule 4-323(c); *see also Marquardt*, 164 Md. App. at 143. This objection does not need to be a formal exception to the ruling, Md. Rule 4-323(d); rather, the objector simply needs to make "known to the circuit court 'what [is] wanted done.'" *Marquardt*, 164 Md. App. at 143 (quoting *Baker*, 157 Md. App. at 610).

In past cases involving excluded *voir dire* questions, we have interpreted Rule 4-323 to require objectors only to notify the trial court of their objections, not to explain or pursue their objections. The Court in *Newman* did not require such an "objection to be stated with particularity or specific language" to meet the requirements of Rule 4-323. 156 Md. App. at 51. An appellant preserves the issue of omitted *voir dire* questions under Rule 4-323 by telling the trial court that he or she objects to his or her proposed questions not being asked. *Marquardt*, 164 Md. App. at 143.[4]

---

[4] The Court of Appeals recognized in *State v. Stringfellow*, 425 Md. 461 (2012), that
(continued...)

There can be no serious dispute that Mr. Smith objected to the omission of the Defense-Witness question. During the time that the trial court set aside for objections to omitted *voir dire* questions, Mr. Smith listed several omitted questions, and the trial court ruled on each. With regard to the Defense-Witness question, the trial court agreed with the State's contention that the thrust of question was covered by a question already asked by Mr. Smith. Under both the plain language of Rule 4-323(c) & (d) and the case law applying the Rule, raising the omitted question preserved Mr. Smith's objection to the omission, and Mr. Smith was not obligated to further pursue his objection regarding the exclusion of the question to preserve the issue for appeal.

### 1. Invited error

Nevertheless, the State contends that Mr. Smith "invited" the court's error when he did not correct "a factual misstatement by the prosecutor." Under the "invited error" doctrine,"'a defendant who himself invites or creates error cannot obtain a benefit—mistrial or reversal—from that error.'" *State v. Rich*, 415 Md. 567, 575 (2010) (quoting *Klauenberg v. State*, 355 Md. 528, 544 (1999)). According to the State, the court was misled into thinking that the Defense-Witness question had been asked, and Mr. Smith's failure to identify the error to the court waived any objection to the omission.

---

[4](...continued)
"an objection to a judge refusing to ask a proposed *voir dire* question" is "not waived by the objecting party's unqualified acceptance thereafter of the jury." *Id.* at 470-71.

8

The State's "invited error" argument would, were we to adopt it, extend a reasonable anti-sandbagging principle to an absurd and unfair extreme. The invited error doctrine makes sense where an *affirmative* act of the appellant produced the error he raises on appeal. For example, our courts have applied the invited error doctrine correctly where the alleged error arose from jury instructions the appellant requested, *see id.* at 581; *Olson v. State*, 208 Md. App. 309, 363-66 (2012), *cert. denied*, 430 Md. 646 (2013); *Wimbish v. State*, 201 Md. App. 239, 264-65 (2011), *cert. denied*, 424 Md. 293 (2012), from the appellant's own jury tampering, *see Ruth v. State*, 133 Md. App. 358, 370-74 (2000); *Allen v. State*, 89 Md. App. 25, 43-45 (1991), or testimony the appellant had elicited on cross-examination. *See Murdock v. State*, 175 Md. App. 267, 294 n.8 (2007).

In contrast, the State argues here that Mr. Smith "invited the court's error" by remaining "silent in the face of a factual misstatement by the *prosecutor*." (Emphasis added). The *State* made the misstatement, not the defendant, and yet the State asks us to find that Mr. Smith waived an objection his counsel made repeatedly (and that the circuit court had ample responsibility to address) because his counsel did not catch and correct *the State's* error. We decline to make that leap. The broader principle underlying our preservation decisions focuses on whether the party objecting on appeal gave the circuit court a proper opportunity to avoid or resolve errors during the trial, not on hyper-technicalities. In this case, Mr. Smith's counsel asked the court to ask potential jurors the Defense-Witness question, and the court decided (for reasons we evaluate next) not to ask it. The prosecutor's mistake appeared

to be an honest one, and we do not mean to suggest any impropriety in the prosecutor's statement that the question had already been asked—there was a lot going on at that point in the process, and to us the transcript reveals a straightforward misunderstanding. It is neither fair nor consistent with our preservation cases, though, to bootstrap the *State's* mistake into a waiver of Mr. Smith's otherwise well-preserved objections, particularly since, as we address next, the question at issue is a mandatory question.

### 2. Defense-Witness *voir dire* question

A Defense-Witness question is aimed specifically at revealing bias among the prospective jurors against witnesses for the defense. *Moore*, 412 Md. at 642. Both the State and Mr. Smith agree that under *Moore*, Mr. Smith was entitled to have the trial court ask the Defense-Witness question during *voir dire*. Both parties also agree that failure of a trial court to ask a requested Defense-Witness question "is not, by definition, harmless" error and that such an omission necessarily requires a new trial, *id.* at 668, and we agree as well.

A Defense-Witness question "falls within the very core of the purpose of *voir dire*, [because] it is designed to uncover venireperson bias." *Id.* at 663. Mr. Smith's Defense-Witness question specifically addressed juror preconceptions of defense witnesses as presumptively less credible, a perception that would directly infringe upon Mr. Smith's right to an impartial and fair trial. *Id.* "[A] trial court must question the venire and consider whether any of the answers reveal such a bias" in a prospective juror. *Id.* at 664. For these reasons, failing to ask the Defense-Witness question—which was not covered by other

10

questions the court did ask—constitutes an abuse of discretion by the trial court. *Id.* at 667-68. Accordingly, we reverse the judgment of the circuit court and remand for further proceedings consistent with this opinion.

**B.** **The Trial Court Erred In Admitting Evidence Of Mr. Smith's Gun Ownership And A Bag Of Ammunition Found In The Apartment Shared By Mr. Smith And The Victim.**

Although we could stop here, we address two of Mr. Smith's other appellate questions that are likely to recur if he is tried again on remand. Among his remaining issues, Mr. Smith argues that the court erred in admitting evidence relating to eight firearms that he owned and to ammunition found in Mr. Smith's apartment. Mr. Smith argued at trial that this evidence was irrelevant and unfairly prejudicial because the weapons and ammunition were unrelated to the shooting in question. The court admitted the evidence over Mr. Smith's objections, emphasizing how "[i]t's not illegal to have other guns and other ammo."

Our review of the trial court's decision to admit the evidence involves two steps of analysis. "'First, we consider whether the evidence is legally relevant, a conclusion of law which we review *de novo*.'" *Brethren Mut. Ins. Co. v. Suchoza*, 212 Md. App. 43, 52 (2013) (quoting *Wash. Metro. Area Transit Auth. v. Washington*, 210 Md. App. 439, 451 (2013)). To qualify as relevant, evidence must tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. Evidence that is relevant is admissible, but the trial court does have not discretion to admit evidence that is not relevant. Md. Rule 5-402;

11

*Simms*, 420 Md. at 724. After determining whether the evidence in question is relevant, we look to whether the court "'abused its discretion by admitting relevant evidence which should have been excluded'" as unfairly prejudicial. *Brethren Mut. Ins. Co.*, 212 Md. App. at 52 (quoting *Wash. Metro. Area Transit Auth.*, 210 Md. App. at 451).

Two characteristics of relevant evidence are "'materiality and probative value.'" *Williams v. State*, 342 Md. 724, 737 (1996) (quoting *State v. Joynes*, 314 Md. 113, 119 (1988)). Evidence is material if it bears on a fact of consequence to an issue in the case. *Id.* at 736-37 (quoting *Joynes*, 314 Md. at 119). Probative value relates to the strength of the connection between the evidence and the issue, to the tendency of the evidence "'to establish the proposition that it is offered to prove.'" *Id.* at 737 (quoting *Joynes*, 314 Md. at 119).

It is not enough, though, for evidence to be relevant. Under Maryland Rule 5-403, the trial court should exclude relevant evidence if the probative value of the evidence "'is substantially outweighed by the danger of unfair prejudice.'" *See Carter v. State*, 374 Md. 693, 705 (2003) (quoting *Andrews v. State*, 372 Md. 1, 19 (2002)). "'Evidence is prejudicial when it tends to have some adverse effect . . . beyond tending to prove the fact or issue that justified its admission.'" *Hannah v. State*, 420 Md. 339, 347 (2011) (quoting *King v. State*, 407 Md. 682, 704 (2009)). We determine whether a particular piece of evidence is unfairly prejudicial by balancing the inflammatory character of the evidence against the utility the evidence will provide to the jurors' evaluation of the issues in the case. In order to admit evidence of a "highly incendiary nature," the evidence must greatly aid the "jury's

12

understanding of why the defendant was the person who committed the particular crime charged." *Gutierrez v. State*, 423 Md. 476, 495, 499 (2011) (declining to admit evidence describing the defendant's gang as more violent than other gangs). A court should *not,* however, admit evidence possessing weak probative value if the evidence might produce a jury inference that the defendant "had a propensity to commit crimes" or "was a person of general criminal character." *Williams*, 342 Md. at 738 (excluding defendant's crow bar and mace from evidence when the investigation of the scene of the burglary revealed no indication of a break in, forced entry, or any other link to the crimes with which the defendant was charged). We exclude prejudicial evidence to avoid the possibility "that a jury will convict the defendant 'because of something other than what he did in that case . . . because of his criminal propensity.'" *Snyder v. State*, 210 Md. App. 370, 395 (2013) (quoting *Odum v. State*, 412 Md. 593, 611 (2010), *cert. denied*, 432 Md. 470 (2013)).

Although there was nothing illegal about Mr. Smith owning guns and ammunition, the evidence the court admitted regarding Mr. Smith's ownership of unrelated firearms and ammunition was minimally relevant, at best, and highly prejudicial, and should have been excluded from the trial of these charges. Neither the State nor the trial judge articulated how this evidence was relevant to whether Mr. Smith committed the alleged crimes. The fact that Mr. Smith legally possessed guns and ammunition does not make the weapons relevant to the victim's death, and we cannot see from this record how the inclusion of this evidence would help prove the offense charged. Without a more direct or tangible connection to the

13

events surrounding *this shooting*, the evidence of the other weapons and ammunition owned by Mr. Smith failed the probativity/prejudice balancing test, and the trial court erred by admitting it.

> **C.** **The Trial Court Did Not Abuse Its Discretion In Admitting Testimony About A Prior Incident In Which Mr. Smith Mishandled A Gun And Was Reprimanded.**

*Finally*, we address Mr. Smith's argument that the court erred in admitting testimony from Mr. Sutherland regarding Mr. Smith's handling of a gun at a barbecue in 2005. Mr. Smith asserts that the testimony suggested that he had a propensity to handle loaded weapons in an irresponsible manner, conduct that reflected negatively on his character. The State responds that Mr. Sutherland's testimony helped to demonstrate Mr. Smith's awareness of the consequences of mishandling a weapon. The testimony in question occurred during the trial on September 5, 2012:

> [COUNSEL FOR THE STATE]: Okay. Getting back to the states and socializing with Gary Smith, was there a time when you or Gary Smith, socially, where he displayed a handgun?
>
> [MR. SUTHERLAND]: Yes.
>
> [COUNSEL FOR THE STATE]: All right. Tell us about that.

Mr. Smith objected to questioning about this topic, but the trial judge overruled his objection. Mr. Sutherland proceeded to describe an incident where he witnessed Mr. Smith mishandling a handgun at a cookout:

> [MR. SUTHERLAND]: Okay. A grilling out. It was on, on post housing. It was a, like a town home, a townhouse type

14

setup. And we were in the, the livingroom in the back of the house watching TV. And I was sitting on, it was kind of like a couch, like a futon type thing, if I recall. And he was sitting to my right and he had what appeared to be, to me, it was like a, like a collapsible stock type pistol with a clip. I don't know what kind of gun it was. I'm not really into guns. I just remember that it was like, I think it was like a semi-automatic. Anyways—

[COUNSEL FOR THE STATE]: A handgun?

[MR. SUTHERLAND]: A handgun. It was a handgun, yes.

[COUNSEL FOR THE STATE]: All right.

[MR. SUTHERLAND]: Like .9, .9 mm.

[COUNSEL FOR THE STATE]: All right.

[MR. SUTHERLAND]: And you know, he, I don't know, he liked to pull it out. He was showing it, showing it off to us. And, and kind of, you know, fondling it and loading it. And—

[COUNSEL FOR THE STATE]: Loading it?

[MR. SUTHERLAND]: Yes. Oh, yeah, he was putting, putting . . . the bullets, actually, in the, in the clip.

[COUNSEL FOR THE STATE]: Okay.

[MR. SUTHERLAND]: And I, I didn't, yeah, there was that time.

[COUNSEL FOR THE STATE]: All right. So tell us what happened when he was loading the weapon.

[MR. SUTHERLAND]: I didn't think he was being real safe with it. He had it kind of pointed kind of towards my leg while he was messing with it. I gave him a look. It wasn't really like any words exchanged, more of like gesturing. And—

15

[COUNSEL FOR THE STATE]: Explain your gesture.

[MR. SUTHERLAND]: Well, it was like, kind of like, "What are you doing, man?["] And, and, and his reaction was, like, you know, like he's got a, he's got a handle on it, like it's no big deal, so.

On cross-examination, Mr. Sutherland clarified aspects of his testimony:

[COUNSEL FOR MR. SMITH]: Okay. And you said he was already loading a weapon?

[MR. SUTHERLAND]: No. No. No. He, when he first sat down, he brought it out, you know, we saw it. And, you know, he had it in his hand. But no, it wasn't immediate. It was not immediate that he was loading it.

[COUNSEL FOR MR. SMITH]: Okay. So at some point, he brings it out—

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: —and it's not loaded?

* * *

[MR. SUTHERLAND]: As far as I know, yes.

[COUNSEL FOR MR. SMITH]: Okay. And so he reaches over and he takes some bullets and he's starting to put them in a clip.

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: Is that right?

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: And did he put the clip back into the gun or just still—

16

[MR. SUTHERLAND]: I don't recall.

[COUNSEL FOR MR. SMITH]: Okay.  So that,—

[MR. SUTHERLAND]: Uh-huh.

[COUNSEL FOR MR. SMITH]: —if you don't recall, then what happens is, is that he may be—There's one of two scenarios, right?  Either he put the clip back into the gun or the gun did not even have the clip in it.  That's what you're really telling us, right?

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: One or the other?

[MR. SUTHERLAND]: Right.

[COUNSEL FOR MR. SMITH]: But whatever it is, whether the gun was empty—

[MR. SUTHERLAND]: Uh-huh.

[COUNSEL FOR MR. SMITH]: —or the gun had a clip in it,—

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: —it was, as he's sitting there, this is all casual stuff, right?

[MR. SUTHERLAND]: Right.

[COUNSEL FOR MR. SMITH]: And it's, it was, the gun, in some fashion, was pointed towards your knee?

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: Right?

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: Okay. And so you had a look because you saw a barrel pointed, it didn't matter where, the knee or whatever, towards you?

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: You sort of looked at him, and it was like, and that was the gesture or whatever following, and that was the end of it?

[MR. SUTHERLAND]: Yes.

[COUNSEL FOR MR. SMITH]: And that's the end of the whole incident, right?

[MR. SUTHERLAND]: Yes.

Maryland Rule 5-404(b) limits evidence of a defendant's prior "bad act[s]," and specifically precludes bad acts evidence offered for the purpose of proving that the defendant's character "in order to show action in conformity therewith." Md. Rule 5-404(b); *Klauenberg v. State*, 355 Md. 528, 546 (1999). A "bad act" is an act or conduct "that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Klauenberg*, 355 Md. at 549. This rule plays a role similar to the prohibition against unfairly prejudicial evidence, *i.e.*, to prevent the jury from "'developing a predisposition of guilt'" based on unrelated conduct of the defendant. *Sinclair v. State*, 214 Md. App. 309, 334 (2013) (quoting *State v. Faulkner*, 314 Md. 630, 633 (1989)).

Although "bad act" evidence is inadmissible to prove a defendant's criminal character, Rule 5-404(b) does allow "bad act" evidence that has "special relevance—that it 'is

18

substantially relevant to some contested issue.'" *Wynn v. State*, 351 Md. 307, 316 (1998) (quoting *State v. Taylor*, 347 Md. 363, 368 (1997)). "Bad act" evidence has a "special relevance if it shows notice, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." *Id.*; Md. Rule 5-404(b). Whether "bad act" evidence demonstrates one of these alternate purposes is a "'legal determination and does not involve any exercise of discretion'" by the trial court; we review this determination *de novo*. *Wynn*, 351 Md. at 317 (quoting *Faulkner*, 314 Md. at 634).

This leads to a two-step analysis. If we determine that the "bad act" evidence in question has special relevance, then we balance the probative value of and need for the evidence against the likelihood of undue prejudice.[5] "'This segment of the analysis implicates the exercise of the trial court's discretion,'" and we will only reverse the court's balancing determination if the court abused its discretion. *Id.* (quoting *Faulkner*, 314 Md. at 634-35).

In this case, Mr. Sutherland's testimony included "bad act" evidence that reflected adversely upon Mr. Smith's character. Mr. Sutherland depicted Mr. Smith as irresponsible and unsafe in handling loaded weapons, which could encourage the jury to infer that Mr.

---

[5] Actually, there is an intervening step: after determining that a piece of "bad act" evidence has special relevance, the court must decide whether the State proved the defendant's involvement in the "bad act" by "'clear and convincing evidence.'" *Wynn*, 351 Md. at 317 (quoting *Faulkner*, 314 Md. at 634-35). Mr. Smith has not challenged this finding in this case, and in any event the testimony offered by Mr. Sutherland regarding his encounter with Mr. Smith was sufficient to support a finding that Mr. Smith acted in the manner he described.

Smith acted in conformance with this character on the night in question. Unless the testimony has an additional quality of special relevance to an issue in the case, then, it should have been excluded under Rule 5-404(b).

The State argues here that this "bad act" has special relevance because it put Mr. Smith on notice of the injurious consequences of mishandling a weapon. As part of its burden of proving involuntary manslaughter, the State needed to demonstrate that Mr. Smith was aware of the risks to Mr. McQueen from mishandling a firearm. The State asserts that Mr. Sutherland's testimony was highly probative of Mr. Smith's knowledge of these risks. Although it is a close call, we ultimately find no abuse of discretion in the circuit court's decision to admit Mr. Sutherland's testimony.

In *Duckworth v. State*, 323 Md. 532 (1991), a battery case in which the defendant allegedly shot a child after his gun accidentally discharged, the trial court admitted testimony that, in a separate incident one week prior, the defendant had accidentally shot the child with a BB gun. *Id.* at 544. The Court of Appeals held that the testimony of the prior BB gun shooting was "clearly relevant" to show the defendant's recklessness in later pointing a gun at the child. *Id.* ("[T]he jury could conclude that the accidental discharge of the BB gun in the earlier incident was a warning to [the defendant] that should have reinforced the need for substantial caution when handling firearms."). And the defendant's failure to heed the warning generated from the earlier BB gun shooting "exacerbated the recklessness involved in the crime charged." *Id.*

20

The court in *Duckworth* held that the first shooting event put the defendant on notice as to the need for caution when handling guns. The same concept applies here, but the two cases are not perfect parallels. In *Duckworth*, the two incidents both resulted in the victim being shot and took place within one week of each other. *Id.* By contrast, the Smith-Sutherland encounter occurred a year later and involved a totally different victim. Moreover, the prior act in *Duckworth* was an actual shooting, whereas the prior act here took the form of a silent gesture or look by Mr. Sutherland and a silent response by Mr. Smith. *Id.* Nevertheless, Mr. Smith's encounter with Mr. Sutherland could well have imparted to Mr. Smith a warning about the need for caution when handling a weapon and demonstrated his awareness of the risks of mishandling a weapon, even if the relevance to the charges is less obvious than Mr. Duckworth's "bad act."

For our purposes, though, the parallel need not be perfect. The trial court is charged with weighing the probative value of Mr. Sutherland's testimony against the likelihood of unfair prejudice. We find the question a close one, but find no abuse of discretion in the court's decision to allow Mr. Sutherland to testify about the prior incident.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**